[Cite as *Key Realty, Ltd. v. Hall*, 2021-Ohio-26.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

Key Realty, Ltd.                                          Court of Appeals No. L-19-1237

      Appellant                                         Trial Court No. CI0201901132

v.

Michael Hall, et al.                                     **DECISION AND JUDGMENT**

      Appellees                                         Decided:  January 8, 2021

* * * * *

Gregory H. Wagoner and Nicholas T. Stack, for appellant.

David A. Nacht, for appellee Michael Hall.

Roman Arce, for appellees Heather Hall, Kenton Fairchild, and
Red 1 Realty, LLC.

* * * * *

**OSOWIK, J.**

{¶ 1} This is an appeal from a judgment of the Lucas County Court of Common

Pleas which granted, in part, and denied, in part, appellees' motions for summary

judgment.  For the reasons set forth below, this court affirms, in part, and reverses, in

part, the judgment of the trial court.

{¶ 2} On January 15, 2019, as amended on March 8, 2019, plaintiff-appellant Key Realty, Ltd. filed a complaint against defendants-appellees Michael Hall; Red 1 Realty, LLC, an Ohio limited liability company; Heather Hall; Kenton Fairchild and Red 1 Realty, LLC, a Florida limited liability company, setting forth claims against Mr. Hall of breach of the non-competition agreement (Count 1) and extortion (Count 11), and claims against all defendants for trade secret misappropriation (Count 2), unfair competition (Count 3), tortious interference with business relations (Count 4), tortious interference with contract (Count 5), breach of fiduciary duty (Count 6), conversion (Count 7), unauthorized use of computer, cable or telecommunication property (Count 8), criminal mischief (Count 9), civil theft (Count 10), spoliation (Count 12), and civil conspiracy (Count 13). Appellant summarized this litigation as follows: "This is an action stemming from the brazen and deceptive actions of [the appellees] to steal [appellant's] information, paralyze [appellant's] operations and then extort [appellant] in an effort to seize [appellant's] business for their own personal benefit."

{¶ 3} Appellees generally denied the allegations and asserted various affirmative defenses. Discovery among the parties ensued. Mr. Hall filed a motion to dismiss on March 22, 2019, which appellant opposed. Mr. Hall and the remaining appellees[1] separately filed motions for summary judgment on June 21, 2019, which appellant

---

[1] Red 1 Realty, LLC, an Ohio limited liability company, and Red 1 Realty, LLC, a Florida limited liability company, were collectively referred to as Red 1 Realty, LLC for the remainder of the litigation.

2.

opposed. At the parties' requests, significant portions of the record were sealed from public access by the trial court. The parties then agreed for the trial court to consolidate its opinion and order on all three pending motions.

{¶ 4} As journalized on October 15, 2019, the trial court stated "there being no just reason for delay" and granted Michael Hall's motion for summary judgment on all counts except Count 1, denied Michael Hall's motion to dismiss as moot, and granted the remaining appellees' motion for summary judgment on all counts applicable to them.

{¶ 5} Appellant filed its notice of appeal setting forth nine assignments of error.

I. The trial court committed reversible error when it dismissed Key Realty's claim that Michael Hall violated the confidentiality provision in his agreement.

II. The trial court committed reversible error when it dismissed Key Realty's trade secret claim.

III. The trial court committed reversible error when it dismissed Key Realty's unfair competition claim.

IV. The trial court committed reversible error when it dismissed Key Realty's tortious interference with business relations and contract claims.

V. The trial court committed reversible error when it dismissed Key Realty's conversion claim.

3.

VI.  The trial court committed reversible error when it dismissed Key Realty's unauthorized use of computer property, criminal mischief, civil theft and extortion claim.

VII.  The trial court committed reversible error when it dismissed Key Realty's spoliation claim.

VIII.  The trial court committed reversible error when it dismissed Key Realty's civil conspiracy claim.

IX.  The trial court committed reversible error when it dismissed Key Realty's breach of fiduciary duty claim against Mike Hall.

## I.  Standard of Review

{¶ 6} Appellate review of trial court summary judgment determinations is de novo, employing the same Civ.R. 56 standard as trial courts.  *Hudson v. Petrosurance, Inc.*, 127 Ohio St.3d 54, 2010-Ohio-4505, 936 N.E.2d 481, ¶ 29.

{¶ 7} Summary judgment may be granted only:

if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  No evidence or stipulation may be considered except as stated in this rule.  A summary judgment shall not be rendered unless it appears from the evidence or stipulation, and only from the evidence or

4.

stipulation, that reasonable minds can come to but one conclusion and that

conclusion is adverse to the party against whom the motion for summary

judgment is made, that party being entitled to have the evidence or

stipulation construed most strongly in the party's favor.

Civ.R. 56(C).

{¶ 8} When seeking summary judgment, the moving party must identify those

portions of the record that affirmatively demonstrate the absence of a genuine issue of

material fact regarding an essential element of the non-movant's case and not rely on

conclusory assertions the non-movant has no evidence to prove its case. *Dresher v. Burt*,

75 Ohio St.3d 280, 296, 662 N.E.2d 264 (1996). When a properly supported motion for

summary judgment is made, an adverse party may not rest on mere allegations or denials

in the pleadings, but must respond with specific facts showing that there is a genuine

issue of material fact for trial in accordance with Civ.R. 56(E). *Id.* at 293. A "material"

fact is one which would affect the outcome of the suit under the applicable substantive

law. *Beckloff v. Amcor Rigid Plastics USA, LLC*, 2017-Ohio-4467, 93 N.E.3d 329, ¶ 14

(6th Dist.).

{¶ 9} We will address the assignments of error out of order.

## II. Misappropriation of Trade Secrets

{¶ 10} In support of its second assignment of error, appellant argues the sealed

evidence in the record showed how appellees accessed and used appellant's trade secret

information to create a similar business model, and that circumstantial evidence of trade

5.

secret misappropriation is sufficient to meet its burden under both common law and the Ohio Uniform Trade Secret Act, R.C. 1331.61, et seq. The sole owner of Key Realty, Ltd., Dennis Degnan, testified at his deposition that the trade secret misappropriated by the appellees is the "concept of Key," which is "pretty much everything." Mr. Degnan's wife, Amy Saylor, who has a membership interest in Key Realty, Ltd., testified at her deposition, "So to elaborate a little bit on what Dennis talked about, there is – the trade secret of Key is that the whole is greater than the sum of its parts."

{¶ 11} In response, appellees collectively argue that appellant's conclusory allegations are insufficient to create genuine issues of material fact. Appellees argue "each and every document and item of information that Appellant claims to be a 'trade secret' was stored or located on **publicly available websites**." (Emphasis sic.) They also obtained information from industry associations. Appellees further argue that appellant's vague notion of a trade secret, the "'concept of Key' is nothing more than limiting the amount of office space traditionally used and occupied by real estate companies." They argue that substantial parts of appellant's business model, the "concept of Key," were publicly known, used by many businesses, and were not proprietary.

{¶ 12} "In order to prevail on a misappropriation-of-trade-secret claim, a plaintiff must show by a preponderance of the evidence: (1) the existence of a trade secret; (2) the acquisition of a trade secret as a result of a confidential relationship; and (3) the unauthorized use of a trade secret." *Heartland Home Fin., Inc. v. Allied Home Mortg.*

6.

*Capital Corp.*, 258 Fed.Appx. 860, 861 (6th Cir.2008); *Tomaydo-Tomahhdo L.L.C. v. Vozary*, 8th Dist. Cuyahoga No. 104446, 2017-Ohio-4292, 82 N.E.3d 1180, ¶ 9.

{¶ 13} Misappropriation of a trade secret is also defined by R.C 1331.61(B) as any of the following:

(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means;

(2) Disclosure or use of a trade secret of another without the express or implied consent of the other person by a person who did any of the following:

(a)Used improper means to acquire knowledge of the trade secret;

(b) At the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret that the person acquired was derived from or through a person who had utilized improper means to acquire it, was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or was derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use;

(c) Before a material change of their position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

**{¶ 14}** "The question whether a particular knowledge or process is a trade secret is a question of fact to be determined by the trier of fact upon the greater weight of the evidence." *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 85 Ohio St.3d 171, 172-83, 181, 707 N.E.2d 853 (1999), paragraph six of the syllabus, *affirming and following Valco Cincinnati, Inc. v. N & D Machining Serv., Inc.*, 24 Ohio St.3d 41, 492 N.E.2d 814 (1986). "A reviewing court should not substitute its judgment for that of the trial court on these factual issues." *Valco Cincinnati* at 47.

**{¶ 15}** A "trade secret" is defined by R.C. 1331.61(D) as:

information, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:

(1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use[; and]

(2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

8.

**{¶ 16}** The Ohio Supreme Court guides us in analyzing a misappropriation of trade secret claim using a six-factor test.

> We * * * [adopt] the following factors in analyzing a trade secret claim: "(1) The extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, *i.e.,* by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information." (Citation omitted.)

*State ex rel. Besser v. Ohio State Univ.*, 89 Ohio St.3d 396, 399-400, 732 N.E.2d 373 (2000).

**{¶ 17}** Appellant, as the "entity claiming trade secret status bears the burden to identify and demonstrate that the material is included in categories of protected information under the statute and additionally must take some active steps to maintain its secrecy." *Id.* at 400. "'[O]nce material is publicly disclosed, it loses any status it ever had as a trade secret.'" (Citation omitted.) *State ex rel. Lucas Cty. Bd. of Commrs. v. Ohio Environmental Protection Agency*, 88 Ohio St.3d 166, 174, 724 N.E.2d 411 (2000).

**{¶ 18}** Appellant argues the following trade secrets are genuine issues of material fact to overcome summary judgment: (1) appellant's business structure, (2) appellant's

9.

budget and business forecasts, (3) appellant's profitability numbers related to its agents and teams, (4) appellant's costs, (5) appellant's future business and growth plans, (6) appellant's vendor names, (7) future programs appellant intended to offer to its agents, (8) appellant's financial performance, (8) implementation of appellant's training program, and (9) appellant's business and marketing structure.

{¶ 19} The trial court was not convinced, and stated in its judgment entry, "While the record contains little to suggest that any of the above are properly characterized as trade secrets, this court need not conduct extensive analysis on the issue." The trial court determined that even if the foregoing were protected trade secrets, appellant failed to demonstrate in the record how appellees used any protected information. The trial court found that appellant misplaced its reliance on the presumption of appellees' possession and knowledge of appellant's trade secrets necessitating the conclusion that the appellees had an immense competitive advantage. "Such a statement is insufficient to establish [appellant's] claim. Absent a showing that [appellees] had in fact made unauthorized use of plaintiff' trade secrets, [appellant's] claim for trade secret misappropriation necessarily fails as a matter of law."

{¶ 20} We reviewed the record de novo and agree with the trial court. Mr. Hall, Mrs. Hall, and Mr. Fairchild each repeatedly testified at their depositions that only publicly available documents and information, plus "wild ass guesses," were used as resources to start the brokerage service known as Red 1 Realty, LLC on January 10, 2019. For example, appellees used Google applications to start and operate the new

10.

brokerage. However, appellant argues that "everything" associated with Key Realty, Ltd. operations was a component part to a uniquely compiled trade secret operation, which Red 1 Realty, LLC "stole." The concepts of novelty, uniqueness, and obviousness may be considered by a court tasked with determining whether information is worthy of trade secret status. *R & R Plastics, Inc. v. F.E. Myers Co.*, 92 Ohio App.3d 789, 801, 637 N.E.2d 332 (6th Dist.1993). Appellant argues that it took ten years to develop the "concept of Key," but appellees respond that appellant's application to real estate concepts that exist in economics and in other industries is not novel or unique.

{¶ 21} Despite appellant's assertions of uniqueness, the speculated conclusions of trade secret misappropriation do not satisfy R.C. 1333.61(D)(1). *State ex rel. The Plain Dealer v. Ohio Dept. of Ins.*, 80 Ohio St.3d 513, 528, 687 N.E.2d 661 (1997). "The Uniform Trade Secrets Act does not apply to the use of memorized information that is not a trade secret pursuant to R.C. 1333.61(D)." *Al Minor & Assoc., Inc. v. Martin*, 117 Ohio St.3d 58, 2008-Ohio-292, 881 N.E.2d 850, ¶ 25.

{¶ 22} Appellant's speculations rest on an unsupported inference that appellees' reliance on publicly available information resulted only in misappropriating appellant's trade secrets to compete with Key Realty, Ltd., despite the sealed record identifying nearly a dozen other companies providing competing real estate brokerage services to Red 1 Realty, LLC. The evidence showed that the publicly available information about these competing real estate brokerages, including appellant, allowed Red 1 Realty, LLC to measure how to incentivize real estate agents to join their startup. It is routine in the

11.

real estate industry for competing brokerage firms to contact each other's agents with recruitment incentives. The standard real estate brokerage company business model primarily makes its money through the real estate agents. "Information that is known generally in the industry is not 'secret' and cannot be afforded trade secret protection." *R & R Plastics, Inc.* at 801-802. For example, we find that appellant's business structure as a limited liability company is publicly available information and not a trade secret.

{¶ 23} As the trial court noted, there is no evidence of how appellees "made unauthorized use of plaintiff's trade secrets." The record shows that Mr. Hall, Mrs. Hall and Mr. Fairchild each testified that Mrs. Hall and Mr. Fairchild started Red 1 Realty, LLC without soliciting information or documents from Key Realty, Ltd. or from Mr. Hall. Mr. Degnan and Ms. Saylor could not testify as to how appellees made unauthorized use of any alleged trade secrets, leaving only speculation that they did. The "piling" of inference upon inference, which amounts to impermissible speculation, does not create a material issue of fact to defeat summary judgment. *Moore v. Ohio Valley Coal Co.*, 7th Dist. Belmont No. 05 BE 3, 2007-Ohio-1123, ¶ 45; *Mitseff v. Wheeler*, 38 Ohio St.3d 112, 115, 526 N.E.2d 798 (1988), citing Civ.R. 56(E).

{¶ 24} Upon de novo review of the record pursuant to Civ.R. 56, we find there is no genuine issue as to any material fact, and appellees, as the moving parties, are entitled to judgment as a matter of law on appellant's claim of misappropriation of trade secrets.

{¶ 25} Appellant's second assignment of error is not well-taken.

12.

### III. Breach of Contract – Nondisclosure Clause

{¶ 26} Appellant's breach of contract claim is not precluded by its misappropriation of trade secrets claim. R.C. 1333.67(B)(1). Although the trial court ultimately denied Mr. Hall summary judgment on appellant's claim of breach of other contract clauses, we find the trial court's determination of "no just reason for delay" was in the interests of sound judicial administration. *Bryant v. Scooter Store*, 6th Dist. Lucas No. L-08-1262, 2009-Ohio-3910, ¶ 18.

{¶ 27} In support of its first assignment of error, appellant argues Mr. Hall violated paragraph six, the nondisclosure clause, of his December 3, 2012 "Non-Competition, Non-Solicitation and Confidentiality Agreement" with appellant (hereafter, the "Agreement"), which was sealed by the trial court, and the trial court erred when it determined "there is insufficient evidence to show that Michael Hall disclosed to the other defendants information concerning Key's business." Paragraph six of the Agreement states:

> 6. INFORMATION. Unless in response to a subpoena or Court Order, Employee, during the term of the Agreement, will not, at any time, in any fashion, form or manner, either directly or indirectly, divulge, disclose, or communicate to any person, firm or corporation in any manner whatsoever any information of any kind, nature or description concerning any matters affecting or relating to the business of Employer, including, without limitation, the names of any of its customers, its prices or costs, or

13.

any other information concerning the business of Employer, its manner of operation, its plans, processes, work in process, or any other data of any kind, nature or description, without regard to whether any or all of the foregoing matters would be deemed confidential, material or important.

{¶ 28} To establish a claim of breach of paragraph six of the Agreement, appellant must "establish the existence of a contract, the failure without legal excuse of the other party to perform when performance is due, and damages or loss resulting from the breach." *Lucarell v. Nationwide Mut. Ins. Co.*, 152 Ohio St.3d 453, 2018-Ohio-15, 97 N.E.3d 458, ¶ 41. "Contract interpretation is a matter of law, and questions of law are subject to de novo review on appeal." *St. Marys v. Auglaize Cty. Bd. of Commrs.*, 115 Ohio St.3d 387, 2007-Ohio-5026, 875 N.E.2d 561, ¶ 38.

{¶ 29} The essential elements of contract formation are "'offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and of consideration.'" *Williams v. Ormsby*, 131 Ohio St.3d 427, 2012-Ohio-690, 966 N.E.2d 255, ¶ 14, quoting *Kostelnik v. Helper*, 96 Ohio St.3d 1, 2002-Ohio-2985, 770 N.E.2d 58, ¶ 16. "A contract is not binding unless supported by consideration." *Id.* at ¶ 15. The existence of consideration is for the court to determine, but the adequacy of consideration is generally left to the parties to the contract to judge for themselves. *Id.* at ¶ 17. Consideration is not found where there is a gratuitous promise, including a conditional gratuitous promise. *Id.* No

14.

action for breach of contract can be brought where the promise was gratuitous. *Hortman v. Miamisburg*, 110 Ohio St.3d 194, 2006-Ohio-4251, 852 N.E.2d 716, ¶ 21.

{¶ 30} The Agreement defines Mr. Hall as "Employee" and appellant as "Employer." The term of the Agreement is stated in paragraph one as the duration of "Employee's employment and for a period of two (2) years following the termination of Employee's employment with Employee for any cause or reason." The Agreement is dated December 3, 2012, and Mr. Hall testified he voluntarily terminated his employment relationship with appellant effective January 10, 2019.

{¶ 31} The Agreement does not define the term "customer" used throughout it, including in paragraph six. The Agreement does not contain or use the terms "agent" or "independent contractor," which have been used throughout this litigation to describe how appellant hired its real estate agents, including Mr. Hall and Mr. Fairchild. However, we find appellant's amended complaint at paragraph 52 instructive to our understanding that the "customers" in the Agreement are distinguished from appellant's employees or real estate agents and are not interchangeable.

{¶ 32} The trial court determined the following regarding appellant's breach of contract claim against Mr. Hall:

Looking to the facts of the instant case, it becomes immediately clear that – despite plaintiff's numerous and emphatic allegations to the contrary – there is insufficient evidence to show that Michel Hall disclosed to the other defendants information concerning Key's business. For

example, while there is evidence that former Key Columbus employees Heather Hall and Fairchild made CSS access and lead generation a part of their business plan immediately after receiving the results of a Key survey that indicated that those two benefits would be of particular interest to agents, and thus a factfinder could reasonably conclude that Heather Hall and Fairchild may have used Key data in formulating their business plan, there is nothing in the record to indicate that they got this information from Michael Hall. To conclude otherwise would be mere speculation of a kind that is insufficient to defeat a summary judgment motion. * * * Accordingly, the record fails to support plaintiff's claim that Michael Hall used Key data in contravention of the express terms of the non-compete agreement.

{¶ 33} It is undisputed in the record that appellant hired Mr. Hall in 2010 as an independent contractor, and he provided real estate agent services for a negotiated fee. By 2012 Mr. Hall was managing agents. Mr. Hall obtained his real estate broker's license in 2014. In 2016, Mr. Degnan increased the percentage of each commission paid to Mr. Hall in exchange for reducing reimbursements to Mr. Hall for Key Realty, Ltd. business expenses.

{¶ 34} Mr. Hall testified at his deposition that Mr. Degnan asked him to sign the Agreement "on the future promise of ownership. * * * I don't recall the exact verbiage that was used in 2012, but something along the lines of you would have a tangible asset

that you would own, that you could also sell." The Agreement has a blank line where the description of the consideration should go. Mr. Hall testified that for six to nine months prior to signing the Agreement Mr. Degnan promised him that the tangible ownership would be "a brokerage firm in the future, that he would work out the details of what that looks like."

{¶ 35} Mr. Degnan testified he could not recall why the consideration statement in the Agreement was left blank: "It, maybe, was an oversight, I don't know." Mr. Degnan further testified:

> So for various business reasons, okay, we decided to head in the direction of what was called the master services agreement. I feel that the discussions we had with Mike in principal or in concept, such as ideas like ownership, ideas of security, ideas of protection against us arbitrarily coming in and saying oh, Mike, you made [certain money] a year, but you're fired, and I'm going to replace you with somebody else for [significantly less money]. We thought Mike was entitled to some protection against that possibility.
>
> * * *
>
> Q: Do you believe that you led Mike Hall to believe that he would receive some sort of ownership interest of saleable assets?
>
> A: Yes.

17.

**{¶ 36}** Before we can interpret paragraph six of the Agreement, we must first resolve the issue of whether Mr. Hall, as an independent contractor, is subject to it. "'Generally, where the evidence is not in conflict or the facts are admitted, the question of whether a person is an employee or an independent contractor is a matter of law to be decided by the court.'" *Perron v. Hood Industries, Inc.*, 6th Dist. Lucas No. L-06-1396, 2007-Ohio-4478, ¶ 34, quoting *Bostic v. Connor*, 37 Ohio St.3d 144, 146, 524 N.E.2d 881 (1988).

**{¶ 37}** "Whether a person is an employee or an independent contractor depends on the character of the arrangement between the person and the employer." *Id.* at ¶ 29, citing *Gillum v. Indus. Comm.* (1943), 141 Ohio St. 373, paragraph two of the syllabus. "The key factual determination is who had the right to control the manner or means of doing the work." *Bostic* at paragraph one of the syllabus. "Where the manner and means of doing work is left to one who is responsible to the employer only for the result, the relationship is that of independent contractor." *Bauer v. Commercial Aluminum Cookware Co.*, 140 Ohio App.3d 193, 200, 746 N.E.2d 1173 (6th Dist.2000).

**{¶ 38}** Unfortunately, the parties' shared intent of Mr. Hall's independent contractor status is not reflected in the Agreement. Rather, paragraph ten of the Agreement states:

> 10. AT WILL EMPLOYEE. Employee acknowledges that he/she is an at will Employee. Nothing in this Agreement shall modify the at will

18.

employment relationship between the parties. Nothing in this Agreement creates, nor is it intended to constitute a contract of employment.

Despite the Agreement stating Mr. Hall is an at-will employee when he was an independent contractor, "the parties' characterization of their relationship in the [Agreement] is not controlling." *Hope Academy Broadway Campus v. White Hat Mgt., L.L.C.*, 145 Ohio St.3d 29, 2015-Ohio-3716, 46 N.E.3d 665, ¶ 41.

{¶ 39} The First District Court of Appeals determined that an independent contractor who can be terminated without cause is comparable to an at-will employee, and continued employment constituted sufficient consideration for an independent contractor agreement containing a non-compete clause, among other restrictions. *Financial Dimensions, Inc. v. Zifer*, 1st Dist. Hamilton No. C-980960, 1999 WL 1127292, *4. However, the independent contractor agreement in that case contained a clear statement that, "[Company] or the Contractor may terminate this Agreement at any time for any reason, without notice." *Id.* at *1. No such statement is in the Agreement before us.

{¶ 40} The Tenth District Court of Appeals reached a similar determination that an independent contractor hired for an indefinite term gave rise to an at-will employment relationship, and continued employment constituted sufficient consideration for the non-compete and non-disclosure agreement. *Americare Healthcare Servs. v. Akabuaku*, 10th Dist. Franklin No. 10AP-777, 2010-Ohio-5631, ¶ 24. However, the non-compete and non-disclosure agreement in that case had a clear consideration clause of "continued and

19.

future engagement of Contractor by Company." *Id.* at ¶ 29. Again, no such statement is in the Agreement before us.

{¶ 41} We find no evidence in the record as to why appellant presented Mr. Hall with the Agreement in late 2012 stating that Mr. Hall is an at-will employee of Key Realty, Ltd. when both Mr. Degnan and Mr. Hall testified Mr. Hall was never an employee. Paragraph 50 of appellant's amended complaint merely states, "As a condition and in consideration of his relationship with Key Realty, Michael Hall executed the * * * Agreement." The Agreement itself leaves the statement of consideration blank. The record gives various possible meanings for the "condition of his relationship" with appellant: independent contractor, future co-owner, and at-will employee.

{¶ 42} The record is clear that appellant's relationship with Mr. Hall did not change as a result of entering into the Agreement. Appellant continued to treat Mr. Hall as an independent contractor, and Mr. Hall continued to act as an independent contractor. We find Mr. Hall was never an at-will employee with an oral contract with appellant. *Mers v. Dispatch Printing Co.*, 19 Ohio St.3d 100, 103, 483 N.E.2d 150 (1985). Because Mr. Hall was never appellant's employee and was never appellant's co-owner, appellant did not provide Mr. Hall with proper consideration when he signed the Agreement. *Lake Land Emp. Group of Akron, LLC v. Columber*, 101 Ohio St.3d 242, 2004-Ohio-786, 804 N.E.2d 27, ¶ 16. At most it appears appellant offered a gratuitous promise as consideration, which is not proper consideration to form a binding contract.

20.

{¶ 43} Upon de novo review of the record pursuant to Civ.R. 56, we find there is no genuine issue as to any material fact with respect to Mr. Hall's alleged breach of paragraph six of the Agreement. Mr. Hall, as the moving party, is entitled to judgment on that issue as a matter of law, and we affirm the trial court's decision. However, we further find that because there was no binding contract between Mr. Hall and appellant, the trial court erred when it denied Mr. Hall summary judgment on the outstanding aspects of appellant's breach of contract claim, and we reverse the trial court's decision.

{¶ 44} Appellant's first assignment of error is not well-taken.

### IV. Tortious Interference with Contract and Business Relations

{¶ 45} To succeed on its tortious interference with business relationships and contracts, appellant must prove "a person, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another, or not to perform a contract with another." *A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 73 Ohio St.3d 1, 14, 651 N.E.2d 1283 (1995). The elements of these torts are similar: (1) the existence of a business or contractual relationship; (2) the wrongdoer's knowledge thereof; (3) an intentional interference causing a breach or termination of the relationship or contract without justification; and (4) damages resulting therefrom. *Firestone v. Galbreath*, 895 F.Supp. 917, 930 (S.D.Ohio 1995); *Wauseon Plaza Ltd. Partnership v. Wauseon Hardware Co.*, 156 Ohio App.3d 575, 2004-Ohio-1661, 807 N.E.2d 953, ¶ 57 (6th Dist.); *Fred Siegel*, 85 Ohio St.3d at 176, 707 N.E.2d 853.

21.

{¶ 46} The Ohio Supreme Court adopted a seven-factor test for determining whether a defendant's conduct intentionally interfered with business relations or a contract: (1) the nature of the defendant's conduct; (2) the defendant's motive; (3) the interests of the plaintiff, the interfered upon party; (4) the interests sought to be advanced by the defendant; (5) the social interests in protecting the freedom of action of the defendant and the contractual or business relations interests of the plaintiff; (6) the proximity or remoteness of the defendant's conduct to the interference; and (7) the relations between the parties. *Id.* at 172, paragraph three of the syllabus; *Wauseon Plaza* at ¶ 62-69.

{¶ 47} For these intentional torts, appellant must provide clear and convincing proof that appellees acted maliciously. *A & B-Abell Elevator* at 14-15; *Haller v. Borror Corp.*, 50 Ohio St.3d 10, 16, 552 N.E.2d 207 (1990). "Ohio does not recognize the tort of negligent interference with contract/business relations." *Bauer*, 140 Ohio App.3d at 200, 746 N.E.2d 1173.

{¶ 48} At the outset, appellant's fourth assignment of error for intentional interference with contract by appellees fails for three reasons. First, we previously found that the Agreement between Mr. Hall and appellant was not binding. Second, we agree with the trial court when it determined that the record contained "no evidence or allegation suggesting the existence of any kind of contract between Key and any of its 150-180 unnamed agents." Third, it is undisputed that appellant had no contracts with Mrs. Hall or Mr. Fairchild.

22.

{¶ 49} The trial court determined that appellant's claim of tortious interference with its business relations and at least 150 real estate agents failed to survive summary judgment. Appellant alleged appellees removed Key Realty owners and managers from a Key Facebook group and used that platform to communicate directly to Key Realty agents in the Columbus area. After applying the *Wauseon Plaza* factors to the evidence in the record, the trial court determined that "the nature of the alleged conduct was minor, and involved nothing more than Facebook group activity of no importance to Key Realty business operations" and that appellees "consistently and repeatedly assert * * * their belief that the Key Facebook group belonged (and continues to belong) to defendant Michael Hall, as the owner of Key Columbus, and not to plaintiff Key." The trial court further determined that "the record is consistent in its showing that defendants' actions were motivated by a desire to promote the Red 1 business, rather than to harm the Key business" and that "there is nothing tortious about Heather Hall's or Fairchild's efforts to recruit Key agents."

{¶ 50} We also agree with the trial court that appellant is limited to an action for breach of contract against Mr. Hall, and may not also recover for tortious interference with business relations. Where a party asserts claims for tortious interference with business relations and with contract, and the alleged interference is with business resulting from the breach rather than with a motive to interfere with actual business relations, then the party is limited to the action for breach of contract and may not recover in tort for business interference. *Digital & Analog Design Corp. v. N. Supply Co.*,

44 Ohio St.3d 36, 46-47, 540 N.E.2d 1358 (1989); *Wauseon Plaza*, 156 Ohio App.3d 575, 2004-Ohio-1661, 807 N.E.2d 953, at ¶ 55.

{¶ 51} From our de novo review of appellant's claim for tortious interference with business relations, we do not find appellant provided clear and convincing evidence that appellees acted maliciously. We find that soliciting for real estate agents from other firms is a common industry practice and actively occurred on behalf of Red 1 Realty, LLC after each appellee severed his/her relationship with appellant. We further find that in 2016 Mr. Hall formed and owned Key Realty Columbus 1, LLC without objection from appellant. To the extent that appellant alleges appellees' tortious conduct arose from the same core facts as appellant's claim of misappropriation of trade secret by appellees, such tort claims are displaced by R.C. 1333.67(A). *Tomaydo-Tomahhdo,* 2017-Ohio-4292, 82 N.E.3d 1180, at ¶ 32; *Stolle Mach. Co., LLC v. RAM Precision Industries*, 605 Fed.Appx. 473, 485 (6th Cir.2015).

{¶ 52} Upon de novo review of the record pursuant to Civ.R. 56, we find there is no genuine issue as to any material fact, and appellees, as the moving parties, are entitled to judgment as a matter of law on appellant's claims of tortious interference with contracts and business relations.

{¶ 53} Appellant's fourth assignment of error is not well-taken.

### V. Unfair Competition

{¶ 54} In support of its third assignment of error, appellant argues that appellees acted in an unfair and unethical commercial manner, and with actual malice, designed to

24.

gain a business advantage and to harm Key Realty's business. Appellant further argues, "[A]ny disclosure or use of the Proprietary Information by Defendants would be unfair and an improper method of competition with Key Realty in violation of Ohio law. Any such disclosure, or use would cause irreparable injury to Key Realty and damage will result to Key Realty therefrom." "Proprietary Information" is defined in the amended complaint as "valuable commercial and practical information as trade secrets."

{¶ 55} "There is a functional difference between unfair competition and disclosure of trade secrets. Unfair competition ordinarily consists of representations by one person, for the purpose of deceiving the public, that his goods are those of another." *Water Mgt., Inc. v. Stayanchi*, 15 Ohio St.3d 83, 85, 472 N.E.2d 715 (1984). "The concept of unfair competition may also extend to unfair commercial practices such as malicious litigation, circulation of false rumors, or publication of statements, all designed to harm the business of another." *Id.* It is important to remember that not all competition is unfair.

{¶ 56} However, where, as here, appellant's unfair competition claim arose in some way from the same core facts as its misappropriation of trade secrets claim, such unfair competition claims are displaced pursuant to R.C. 1333.67(A). *Tomaydo-Tomahhdo*, 8th Dist. No. 104446, 2017-Ohio-4292, 82 N.E.3d 1180, at ¶ 32; *Stolle Mach.*, 605 Fed.Appx. 473 at 484. We find that appellant's unfair competition claim regarding "Proprietary Information" does not have independent facts from its trade secrets claim. *Id.* at 485. Having found appellant's misappropriation of trade secrets

25.

claims failed to overcome summary judgment, this aspect of appellant's unfair competition claim also fails.

{¶ 57} Appellant also argues there are genuine issues of fact of appellees' unfair competition for the following: (1) "Circumventing Mike Hall's obligations under the Agreement but concealing his ownership while advising other entities that Mike Hall was a 'partner' in this business," by pointing to sealed emails in the record indicating Mr. Hall inquiring about potential health benefit coverage from an insurance provider after leaving Key Realty and to an email indicating Mr. Fairchild requesting a non-party to "friend request" all Columbus Board of Realtors agents in Facebook; (2) "Mike Hall's abuse of his position at Key Realty to recruit Key Realty's agents to Red One while he was still at Key Realty"; (3) "Appellees blocking Key Realty from its communication systems while they were recruiting Key Realty's agents"; (4) "Appellees advising Key Realty's agents alleging that Key Realty broke promises to agents, * * * but later acknowledging that it could not identify any broken promises," by pointing to a sealed Google Slide used by Mrs. Hall and Mr. Fairchild at their grand opening event for Red 1 Realty, LLC and pointing to Mrs. Hall's deposition explaining what she meant by the broken promises to management and agents; (5) "Appellees removing Key Realty's agents from the forums if they did not transfer to Red One"; (6) "Appellees extorting Key Realty to obtain a rescission of the Agreement by agreeing to return the property they took from Key Realty," by pointing to Mr. Hall's sealed email to Mr. Degnan requesting a rescission of the Agreement, which Mr. Hall did not believe was a bilateral contract, and offered to

negotiate a termination of the Agreement and release; (7) "Appellees creating confusion which resulted in several agents questioning whether Key Realty maintained an office in Columbus," by pointing to a sealed email from a non-party to a non-party asking about the Key Realty office locations in Columbus and in Marietta, which we find is inadmissible hearsay pursuant to Evid.R. 802; and (8) "Appellees canceling Key Realty's kick-off party and converting it to Red One's 'Grand Opening' Party."

{¶ 58} The trial court determined the evidence showed appellees desired to grow their own business, not to harm appellant. The competition appellees engaged in with appellant was not unfair because they were also simultaneously competing with all other real estate brokerage services companies. The record lacks evidence that anyone believed that Red 1 Realty, LLC was really just appellant or that Red 1 Realty, LLC held itself out to the public as appellant. There was no evidence that any agent or broker of Red 1 Realty, LLC claimed to be the agent or broker of appellant. The record shows that Red 1 Realty, LLC's name and logo, not appellant's, appeared on all of its publicly available information. The trial court acknowledged that the genuine issue of fact as to who owned a particular "Key Facebook group" did not arise to meet an expanded definition of unfair competition because of the lack of evidence in the record that appellees' actions were "designed to harm the business of another."

{¶ 59} We agree with the trial court. Appellant points to the record evidence for only four of its eight claims of genuine issues of material fact for its unfair competition claim. App.R. 12(A)(2). We find that the evidence appellant pointed to does not support

27.

finding admissible facts in evidence that are both genuine and material. It is apparent from the record that appellant perceived all of appellees' actions, both direct and indirect, were hostile and designed to harm appellant. Yet appellant fails to show where in the record appellees designed the launch of Red 1 Realty, LLC with malice towards appellant to cause harm, other than appellant's own speculations.

{¶ 60} Upon de novo review of the record pursuant to Civ.R. 56, we find there is no genuine issue as to any material fact with respect to appellant's alleged unfair competition claim. Appellees, as the moving parties, are entitled to judgment on that issue as a matter of law.

{¶ 61} Appellant's third assignment of error is not well-taken.

## VI. Conversion

{¶ 62} In support of its fifth assignment of error, appellant's amended complaint states as its conversion claim that appellees "converted Key Realty's property without any consent or authorization. Defendants' conduct was a wrongful interference with Key Realty's property rights." Appellant argues the property rights at issue included, "a Key Realty Central Ohio Facebook page maintained exclusively for Key Realty agents," Key Realty e-mail accounts and websites, "calendars, Google Drive resources, and other electronic and physical property and documents."

{¶ 63} The trial court determined:

> In analyzing plaintiff's claim, it is noted that the parties do not
>
> dispute that Michael Hall came into possession of the subject property

lawfully, during his engagement with Key. Thus, plaintiff is required to show the following additional elements in order to establish its claim for conversion: 1) that plaintiff demanded the return of the property after defendants exercised dominion or control over it; and 2) that defendants refused to deliver the property to plaintiff. * * * Unfortunately for plaintiff, plaintiff fails to assert – and this court's review of the record has failed to reveal evidence of – any demand on the part of plaintiff for the return of the property in question, let alone any refusal on the part of defendants. Absent evidence to establish these additional elements of plaintiff's claim, summary judgment is properly entered in favor of defendants, and against plaintiff, with respect to plaintiff's claim of conversion.

{¶ 64} The Ohio Supreme Court has held "that conversion is the wrongful exercise of dominion over property to the exclusion of the rights of the owner, or withholding it from his possession under a claim inconsistent with his rights." *Joyce v. Gen. Motors Corp.*, 49 Ohio St.3d 93, 96, 551 N.E.2d 172 (1990); *Peirce v. Szymanski*, 6th Dist. Lucas No. L-11-1298, 2013-Ohio-205, ¶ 19. "To prevail on a conversion claim, a plaintiff must demonstrate: (1) the plaintiff's ownership or right to possession of the property at the time of the conversion; (2) defendant's conversion by a wrongful act or disposition of the plaintiff's property right; and (3) damages." *Id.* "If the defendant came into possession of the property lawfully, the plaintiff must prove two additional elements to establish conversion: (1) that the plaintiff demanded the return of the property after the defendant

exercised dominion or control over the property; and (2) that the defendant refused to deliver the property to the plaintiff." *Id.*; *Brown Motor Sales, Inc. v. Keeley*, 6th Dist. Lucas No. L-95-330, 1996 WL 549231, *9 (Sept. 30, 1996); *Elling v. Witt*, 6th Dist. Ottawa No. 94OT032, 1995 WL 54127, *2 (Feb. 10, 1995); *College Station v. Knowles*, 6th Dist. Lucas No. L-93-060, 1993 WL 496687, *6 (Dec. 3, 1993). The lack of evidence in the record that appellant demanded appellees return of the allegedly converted property is fatal to appellant maintaining a cause of action for conversion. *Id.* Appellant must provide competent, credible evidence in the record to support its conversion claim. *Elling* at *3.

{¶ 65} Appellant alleges it "made an effort to resolve this matter and obtain its property from Mike Hall and Red One prior to filing the Complaint and moving for a temporary restraining order. (Appx. 39, 3:1-22.)" However, the record does not contain the enumerated appendix cited by appellant, nor the transcript of the temporary restraining order proceedings. The record does not contain the alleged evidence of appellant demanding from each appellee the return of Key Realty, Ltd. property and each appellee's refusal to do so, even though appellees came into possession of the disputed property lawfully.

{¶ 66} It is undisputed that Mr. Hall owned Key Realty Columbus 1, LLC. We find the disputed property, such as Facebook groups and a Google Drive associated with keyrealtycolumbus@gmail.com, not, for example, columbus@keyrealtyagent.com, were created specifically for Key Realty Columbus 1, LLC, and not Key Realty, Ltd. Pursuant

30.

to how Google Drive works, Mr. Hall was only able to "unshare" the Google Drive documents he "owned." Mrs. Hall worked unpaid for Key Realty Columbus 1, LLC, and not Key Realty, Ltd. Mr. Fairchild was an independent contractor agent for Key Realty, Ltd. and worked for Key Realty Columbus 1, LLC as a broker. In these roles, each appellee had Mr. Hall's consent to access to the property created for Key Realty Columbus 1, LLC. In addition, the undisputed evidence is that Mr. Hall owned Key Realty Columbus 1, LLC, Key Realty Cincinnati 1, LLC, Key Realty Cleveland 1, LLC, and other entities, and owned the electronic resources created for them.

{¶ 67} Upon de novo review of the record pursuant to Civ.R. 56, we find there is no genuine issue as to any material fact with respect to appellant's alleged conversion claim, and appellees, as the moving parties, are entitled to judgment on that issue as a matter of law.

{¶ 68} Appellant's fifth assignment of error is not well-taken.

### VII. Unauthorized Use of Computer Property, Criminal Mischief, Civil Theft, Extortion

{¶ 69} In support of its sixth assignment of error, appellant alleges it may recover damages in a civil action pursuant to R.C. 2307.60 for claims that appellees violated four criminal statutes: R.C. 2913.04(B) (unauthorized use of computer, cable or telecommunication property), R.C. 2909.07(A)(6)(a) (criminal mischief), R.C. 2307.61 (civil theft), and R.C. 2905.11 (extortion).

31.

{¶ 70} Appellant alleges the trial court erred by concluding that as a matter of law, "Appellees did not intend to commit any of the alleged criminal acts because they believed the various e-mail and social media accounts, websites, electronic resources, leases, and other related property did not belong to Key Realty." Appellant further argues that the trial court ignored Mr. Hall's "admission that his Agreement made it 'very clear' that the materials and accounts in question belonged to Key Realty and Fairchild and Heather's admission that they were aware of the (sic) Mike Hall's Agreement."

{¶ 71} R.C. 2307.60(A)(1) authorizes a civil action for damages caused by criminal acts, unless otherwise prohibited by law. *Jacobson v. Kaforey*, 149 Ohio St.3d 398, 2016-Ohio-8434, 75 N.E.3d 203, ¶ 10. However, the Ohio Supreme Court provided no guidance "regarding how the statute operates or what a plaintiff must do to prove a claim under R.C. 2307.60(A)(1) * * *." *Id.* at ¶ 11. Since then, the Ohio Supreme Court has clarified that a plaintiff is not required to prove the existence of an underlying criminal conviction to support the plaintiff's claim for civil liability under R.C. 2307.60. *Buddenberg v. Weisdack*, Slip Opinion No. 2020-Ohio-3832, ¶ 11.

### A. Unauthorized Use of Computer Property

{¶ 72} Appellant alleges appellees violated R.C. 2913.04(A)-(B), a criminal statute that states:

> (A) No person shall knowingly use or operate the property of another without the consent of the owner or person authorized to give consent.

(B) No person, in any manner and by any means * * * shall

knowingly gain access to, attempt to gain access to, or cause access to be

gained to any computer, computer system, computer network, * * *, or

information service without the consent of, or beyond the scope of the

express or implied consent of, the owner of the computer, computer system,

computer network, * * *, or information service or other person authorized

to give consent.

{¶ 73} "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). R.C. 2913.01(D) defines "owner" as "any person, other than the actor * * *." R.C. 2913.01(T) defines "gain access" as "to approach, instruct, communicate with, store data in, retrieve data from, or otherwise make use of any resources of a computer, computer system, or computer network * * *."

{¶ 74} The trial court determined that appellees held "an unwavering position" that any disputed electronic resources used or accessed by them, if any, were the property of Key Realty Columbus 1, LLC, undisputedly owned by Mr. Hall. Although appellant claimed that all resources were Key Realty, Ltd. resources, it failed to provide evidence that appellees "'knowingly' used and operated the electronic resources without proper consent."

{¶ 75} We agree with the trial court that appellant failed to establish key elements of the alleged crime. It is undisputed that Mr. Hall owned Key Realty Columbus 1, LLC,

33.

and as the owner, he cannot also be the actor allegedly violating R.C. 2913.04(A)-(B) with the disputed electronic records he specifically created for Key Realty Columbus 1, LLC, and not Key Realty, Ltd. Mrs. Hall and Mr. Fairchild had Mr. Hall's consent to access to the computer-related resources created for Key Realty Columbus 1, LLC.

{¶ 76} Despite appellant insisting that under the Agreement Key Realty, Ltd. owned "everything," we have already found Mr. Hall is not subject to the Agreement. We find that the admission Mr. Hall made during his sealed deposition was that, under the Agreement, materials and accounts created for Key Realty, Ltd. were owned by Key Realty Ltd.

{¶ 77} Upon de novo review of the record pursuant to Civ.R. 56, we find there is no genuine issue as to any material fact, and appellees, as the moving parties, are entitled to judgment as a matter of law on appellant's claim of unauthorized use of computer property.

## B. Civil Theft

{¶ 78} Appellant alleges that appellees violated R.C. 2307.61(A), which states:

> If a property owner brings a civil action pursuant to [R.C. 2307.60(A)] to recover damages from any person who willfully damages the owner's property or who commits a theft offense, as defined in [R.C. 2913.01], involving the owner's property, the property owner may recover [damages] * * *.

34.

**{¶ 79}** Appellant does not specify which theft offense it alleges appellees violated. R.C. 2913.01(K)(1) defines "theft offense" as including a violation of R.C. 2913.04. Having already determined that appellant failed to support its claim appellees violated R.C. 2913.04, we find appellant also fails to support its claim for damages pursuant to R.C. 2307.61(A).

**{¶ 80}** Upon de novo review of the record pursuant to Civ.R. 56, we find there is no genuine issue as to any material fact, and appellees, as the moving parties, are entitled to judgment as a matter of law on appellant's claim of civil theft.

### C. Extortion

**{¶ 81}** Appellant alleges appellees violated R.C. 2905.11(A)(1), which states: "No person, with purpose to obtain any valuable thing or valuable benefit or to induce another to do an unlawful act, shall do any of the following: (1) Threaten to commit any felony."

**{¶ 82}** Appellant argues the trial court ignored the evidence that "Appellees attempted to use their theft of Key Realty's property to obtain a rescission of Hall's Agreement with Red One. This demonstrates that Appellees' engaged in knowing and intentional conduct." Appellant alleges Mr. Hall threatened to violate R.C. 2913.04, which we previously determined did not survive summary judgment. Appellant further alleges Mr. Hall threatened to violate R.C. 2913.02(A)(1)-(4), which states, "No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways: (1) without the

35.

consent of the owner * * *; (2) beyond the scope of the express or implied consent of the owner * * *"; (3) by deception; (4) by threat * * *."

{¶ 83} The trial court determined that appellant's evidence to support this claim "reveals no threat by Michael Hall to commit any theft offense, whatsoever. * * * Thus, there is nothing in the record to suggest that Michael Hall either 1) threatened to knowingly obtain or exert control over Key property or services; or 2) engaged in the unauthorized use of computer or telecommunication property * * *." The specific moment of extortion provided by appellant is an email from Mr. Hall to Mr. Degnan showing "nothing more than an intent on the part of Michael Hall to negotiate with his former employer [to rescind the Agreement], using items he 'owned' as leverage to assist with his negotiations." We agree with the trial court. Appellant failed to provide evidence of necessary elements of the criminal offense of extortion.

{¶ 84} Upon de novo review of the record pursuant to Civ.R. 56, we find there is no genuine issue as to any material fact, and appellees, as the moving parties, are entitled to judgment as a matter of law on appellant's claim of extortion.

### D. Criminal Mischief

{¶ 85} Appellant alleges appellees violated R.C. 2909.07(A)(6)(a), which states:

No person shall: * * * [W]ithout privilege to do so, and with intent to impair the functioning of any computer, computer system, computer network, computer software, or computer program, knowingly do any of the following: (a) In any manner or by any means, including, but not

limited to, computer hacking, alter, damage, destroy, or modify a computer, computer system, computer network, computer software, or computer program or data contained in a computer, computer system, computer network, computer software, or computer program.

{¶ 86} The trial court determined that appellant's claims of impaired functioning of Key Realty, Ltd. computer systems and electronic resources failed because the evidence showed appellees, if proven they did so act, acted with the intent to benefit Red 1 Realty, LLC, and not to impair the functioning of any Key Realty, Ltd. computer systems.

{¶ 87} We agree with the trial court. The record shows that appellees' actions to, for example, unshare Mr. Degnan and Ms. Saylor from Facebook groups and Google Drives were because those electronic resources were associated with keyrealtycolumbus@gmail.com, which Mr. Hall created for Key Realty Columbus 1, LLC, the Ohio limited liability company Mr. Hall owned and continues to own. Although appellant alleges the trial court engaged in impermissible credibility determinations on summary judgment, we disagree. We, like the trial court, find the record lacks evidence from appellant that appellees, who had access privileges to the disputed electronic resources, intended to impair the functioning of Key Realty, Ltd. computers and computer systems.

37.

{¶ 88} Upon de novo review of the record pursuant to Civ.R. 56, we find there is no genuine issue as to any material fact, and appellees, as the moving parties, are entitled to judgment as a matter of law on appellant's claim of criminal mischief.

{¶ 89} Appellant's sixth assignment of error is not well-taken.

### VIII. Spoliation

{¶ 90} In support of its seventh assignment of error, appellant alleges appellees "knew that as a result of their actions there would be probable litigation involving Key Realty, yet upon information and belief Defendants willfully destroyed evidence by deleting emails, computer files, online posts, and other electronic information as well as discarding physical documents into the trash" with the intent to disrupt appellant's case. Appellant alleges that on the same day the trial court granted a temporary restraining order and ordered appellees to transfer access to appellant's social media accounts back to appellant, Mrs. Hall, without explanation, "deleted several posts and removed several group members from the Key Realty Facebook platform." Appellant further alleges that Mr. Hall "deleted items from the same Facebook platform and, additionally, certain items were 'removed' from Hall's calendar."

{¶ 91} To prevail on a tort of intentional spoliation of evidence, appellant must prove the following elements: "'(1) pending or probable litigation involving the plaintiff, (2) knowledge on the part of defendant that litigation exists or is probable, (3) willful destruction of evidence by defendant designed to disrupt the plaintiff's case, (4) disruption of the plaintiff's case, and (5) damages proximately caused by the

38.

defendant's acts.'" *Elliott-Thomas v. Smith*, 154 Ohio St.3d 11, 2018-Ohio-1783, 110 N.E.3d 1231, ¶ 10, quoting *Smith v. Howard Johnson Co., Inc.*, 67 Ohio St.3d 28, 29, 615 N.E.2d 1037 (1993).

{¶ 92} The trial court determined that, "Even accepting, arguendo, that defendants may have willfully destroyed evidence in an attempt to disrupt plaintiff's case, there is simply no evidence or allegation to suggest that any disruption to plaintiff's case occurred." The trial court further determined, "Nor is there any evidence or allegation concerning any damages that may have been proximately caused by defendants' acts." We agree with the trial court. No willful destruction of evidence by appellees and actual disruption to appellant's case is found in the record to support appellant's allegation of this intentional tort.

{¶ 93} Upon de novo review of the record pursuant to Civ.R. 56, we find there is no genuine issue as to any material fact, and appellees, as the moving parties, are entitled to judgment as a matter of law for appellant's claim of intentional spoliation of evidence.

{¶ 94} Appellant's seventh assignment of error is not well-taken.

### IX. Civil Conspiracy

{¶ 95} To support its eighth assignment of error, appellant alleges appellees "combined to maliciously commit one or more of the unlawful acts described above, which resulted in actual damages to Key Realty." Appellant further alleges "there is significant evidence to demonstrate that Appellees, in concert, engaged in intentional conduct to unfairly compete against Key Realty, convert Key Realty's property,

39.

intentionally interfere with Key Realty's business relationship with its agents, and intentionally interfere with Mike Hall's Agreement with Key Realty."

{¶ 96} To prevail on a tort of civil conspiracy, appellant must prove the following elements: "'(1) a malicious combination, (2) involving two or more persons, (3) causing injury to person or property, and (4) the existence of an unlawful act independent from the conspiracy itself.'" *Peirce*, 6th Dist. Lucas No. L-11-1298, 2013-Ohio-205, at ¶ 21, quoting *State ex rel. Fatur v. Eastlake,* 11th Dist. No. 2009-L-037, 2010-Ohio-1448, ¶ 45. "The conspiracy claim must be pled with some degree of specificity, and vague or conclusory allegations that are unsupported by material facts will not be sufficient to state a claim." *Avery v. Rossford, Ohio Transp. Improvement Dist.*, 145 Ohio App.3d 155, 165, 762 N.E.2d 388 (6th Dist.2001). Appellant "must allege actual damages attributable to the conspiracy in addition to those damages caused by the underlying tort." *Id.* at 165.

{¶ 97} The trial court determined, "Because summary judgment has been granted on every count, except the first, against Michael Hall, for breach of contract, plaintiff cannot, as a matter of law, establish that there was a 'malicious combination of two or more persons' to injure it." We agree with the trial court. We find that appellant fails to make viable claims for an unlawful underlying action to support its claim of civil conspiracy. *Peirce* at ¶ 22.

{¶ 98} Upon de novo review of the record pursuant to Civ.R. 56, we find there is no genuine issue as to any material fact, and appellees, as the moving parties, are entitled to judgment as a matter of law on appellant's claim of civil conspiracy.

40.

{¶ 99} Appellant's eighth assignment of error is not well-taken.

## X.  Breach of Fiduciary Duty

{¶ 100} To support its ninth assignment of error, appellant alleges that Mr. Hall "had a fiduciary relationship with Key Realty.  It was clearly established in the Agreement" and by his regular participation "in management meetings where Key Realty's confidential business information was discussed and Mike Hall supervised Key Realty's agents in the Columbus are."  Appellant argues Mr. Hall's breaches are: (1) concealing his ownership interest in Red 1 Realty, LLC; (2) recruiting Key Realty, Ltd. agents to Red 1 Realty, LLC while he was still at Key Realty, Ltd.; (3) changing passwords on Key Realty, Ltd. communication platforms to deny access; (4) blocking Key Realty, Ltd. from its communication systems while recruiting Key Realty, Ltd. agents; and (5) extorting Key Realty, Ltd. to obtain a rescission of his Agreement.

{¶ 101} The trial court determined, "Even accepting all of plaintiff's assertions as true, plaintiff fails to demonstrate how Michael Hall 'agreed to act primarily for the benefit of [Key] in matters connected with its [business].'"  The trial court continued, "to the contrary, Michael Hall repeatedly asserts that, as the owner of Key Columbus, he was responsible for his own companies and his own costs.  Thus, plaintiff fails to establish the existence of a fiduciary relationship between itself and Michael Hall."  The trial court found, "Even, assuming arguendo, the existence of a fiduciary relationship, plaintiff fails to articulate the specific duty that was owed to Key and/or how Michael Hall may have

41.

breached it.  As either failure is fatal to plaintiff's claim, summary judgment is properly entered in favor of Michael Hall, and against plaintiff with respect to this issue."

{¶ 102} It is undisputed in the record that Mr. Hall was an independent contractor of Key Realty, Ltd.  An independent contractor generally has no fiduciary relationship to his or her employer unless both parties understand that the relationship is one of special trust and confidence.  *Hope Academy*, 145 Ohio St.3d 29, 2015-Ohio-3716, 46 N.E.3d 665, at ¶ 73. Appellant points to the preamble statement in the Agreement with Mr. Hall that, "Employee is employed by Employer in a position of trust and confidence, requiring a high degree of loyalty, honesty and integrity."  However, we have already determined that Mr. Hall was not subject to the Agreement.  We further find that appellant fails to establish by clear and convincing evidence that Mr. Hall owed appellant a duty arising out of a fiduciary relationship that was not based on the Agreement.

{¶ 103} "A claim of breach of a fiduciary duty is basically a claim of negligence, albeit involving a higher standard of care." *Strock v. Pressnell*, 38 Ohio St.3d 207, 216, 527 N.E.2d 1235 (1988).  "In order to succeed on a breach-of-fiduciary-duty claim, a plaintiff must prove the existence of a duty arising out of a fiduciary relationship, failure to observe that duty, and injury resulting proximately therefrom." *Burns v. Burns Iron & Metal Co.*, 6th Dist. Sandusky No. S-12-024, 2013-Ohio-2024, ¶ 17; *Newcomer v. Natl. City Bank*, 6th Dist. No. WM-12-007, 2014-Ohio-3619, 19 N.E.3d 492, ¶ 9.  Appellant's burden of proof is clear and convincing evidence of each element for a breach of fiduciary duty claim. *Id.* at ¶ 48.

42.

{¶ 104} The existence of a duty arising out of a fiduciary relationship is a question of law to be initially determined by the court. *Driftmeyer v. Carlton*, 6th Dist. Lucas No. L-06-1029, 2007-Ohio-2036, ¶ 50-52. "'A "fiduciary relationship" is one in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust.'" (Citations omitted.) *Hope Academy* at ¶ 82. "A 'fiduciary' has been defined as '"a person having a duty, created by his undertaking, to act *primarily for the benefit of another* in matters connected with his undertaking."' (Emphasis sic.)" (Citation omitted.) *Strock* at 216.

{¶ 105} Upon de novo review of the record pursuant to Civ.R. 56, we find there is no genuine issue as to any material fact, and Mr. Hall, as the moving party, is entitled to judgment as a matter of law. We leave undisturbed the trial court's determination granting Mrs. Hall and Mr. Fairchild summary judgment on appellant's claim of breach of fiduciary duty. App.R. 12(A)(2).

{¶ 106} Appellant's ninth assignment of error is not well-taken.

## XI. Conclusion

{¶ 107} On consideration whereof, this court finds that there remain no genuine issues of material fact and, after construing all the evidence most strongly in favor of appellant, reasonable minds can come to but one conclusion that appellees are entitled to summary judgment as a matter of law. The judgment of the Lucas County Court of Common Pleas is affirmed, in part, and reversed with respect to the trial court's denial of

43.

summary judgment to Mr. Hall on the outstanding aspects of appellant's breach of contract claim. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed, in part,
and reversed, in part.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Arlene Singer, J.
_____
_____
JUDGE

Thomas J. Osowik, J.
CONCUR.
_____
JUDGE

Christine E. Mayle, J.
CONCURS IN PART, DISSENTS
IN PART, AND WRITES
SEPARATELY.
_____
JUDGE

**MAYLE, J.**

{¶ 108} Respectfully, I concur, in part, and dissent, in part.

{¶ 109} I agree with the majority's decision to affirm summary judgment with respect to (1) that part of Key Realty's claim for tortious interference with contract that relates to interference with alleged contracts between Key Realty and its agents, (2) Key Realty's spoliation claim against Hall and Fairchild (but not against Heather), and

(3) Key Realty's claim for criminal mischief. I also agree with the majority's ultimate conclusion to affirm summary judgment on the claim for misappropriation of trade secrets, but for different reasons.

{¶ 110} I disagree with the majority on the remainder of its decision. In my view, the majority's decision is based upon an improper and wholesale acceptance of appellees' version of events despite conflicting testimony and evidence relating to material questions of fact. So much of this case requires an evaluation of witness credibility, which is inappropriate at the summary judgment phase. The ultimate fact finder—not this court—should determine which witnesses should be believed, and which witnesses should not.

{¶ 111} In order to properly analyze the various claims and my points of disagreement with the majority, it is necessary to lay out an overview of the facts of this case—which, under Civ.R. 56, must be viewed in a light most favorable to Key Realty.[2]

_____

[2] On April 19, 2019, the trial court signed a Stipulated Protective Order, presumably because this case involves a claim by Key Realty against appellees for misappropriation of trade secrets. The order, among other things, allowed the parties to designate certain discovery materials as "confidential" so that they cannot be used for any purposes outside this litigation—which is not uncommon—and highly confidential and proprietary information as "attorneys eyes only." Before the parties filed their respective briefs and evidence related to the summary judgment proceeding, the trial court granted their motions to file *all* of the supporting deposition transcripts, exhibits, and briefing under seal—without any argument or analysis of why such a drastic restriction of public access was necessary when many less-restrictive options (redaction, etc.) are available. Under the Rules of Superintendence for the Courts of Ohio, the trial court should have undertaken an analysis to determine whether the moving party demonstrated by "clear and convincing evidence that the presumption of allowing public access is outweighed by

45.

## I. Factual Background of this Dispute

{¶ 112} Mike Hall began his real estate career as an agent working for Golden Gate Real Estate as an independent contractor, where he worked for approximately four years. During that time, he was also employed by Old Republic Home Warranty as a home warranty representative. In 2010, Hall left Golden Gate and became a real estate agent for Key Realty, which was owned by Dennis Degnan and his wife, Amy Saylor. At that time, Hall continued in his employment with Old Republic while working as a realtor for Key Realty as an independent contractor.

{¶ 113} Hall terminated his employment with Old Republic in "2011 or '12" because he "was moving into a different role within Key Realty" at that time. That is, "sometime around 2012," Hall transitioned into a management role at Key Realty and began overseeing agents. Over the years that followed, Hall's work for Key Realty continued to grow, and he was eventually promoted to director.

---

a higher interest" after considering certain enumerated factors. Sup.R. 45(E)(2). Moreover, the trial court was required to use the "least restrictive means available" when restricting public access. Sup.R. 45(E)(3). Here, no such analysis was undertaken before the trial court sealed the records, and a blanket sealing order is certainly not the "least restrictive means available." For these reasons, I believe that the trial court's sealing of the summary judgment records does not impact the work that must be done by this court on appeal. Perhaps more importantly, the parties filed their appellate briefs—including voluminous exhibits containing lengthy deposition excerpts and the key evidentiary material relating to summary judgment—on the public docket.

46.

{¶ 114} At all times, Hall worked for Key Realty as an independent contractor. As an independent contractor, he did his work for Key Realty through Key Realty Columbus 1, LLC ("Key Columbus"), a limited liability company that he owned.

## A. The Non-Competition, Non-Solicitation, and Confidentiality Agreement

{¶ 115} It is undisputed that on December 12, 2012, Hall signed a Non-Competition, Non-Solicitation, and Confidentiality Agreement with Key Realty. But, the parties dispute the circumstances surrounding the execution of the non-compete agreement.

{¶ 116} Hall claims that he signed the non-compete agreement because Degnan had promised him a "future ownership" interest in Key Realty over the course of "two to three" conversations in 2012. Degnan, however, flatly denied this. He testified:

That's ridiculous, okay? Why would – this is someone who had no track record as manager, whatsoever. * * * Why would I give somebody an offer of ownership in a company? He was untested as a manager. He had no track record, whatsoever, in real estate management. So the idea that I had conversations with him about ownership in 2012 are simply not true.[3]

---

[3] The majority quotes a different portion of Degnan's deposition testimony, in which he confirms that he "led Mike Hall to believe that he would receive some sort of ownership interest of saleable assets." That line of questioning, however, concerned conversations between Hall and Degnan *in 2018*—more than five years after Hall signed the agreement and assumed a management role at Key Realty. At that time, Degnan presented Hall with a master services agreement under which Hall would have had an ownership of a separate LLC and a management agreement with Key Realty—which is the "saleable asset" that Degnan was referring to.

47.

{¶ 117} The written agreement does not contain any promises of "future ownership" in Key Realty. The agreement is a form contract, and it is couched in terms of an employer/employee relationship—referring to Hall as "Employee" and Key Realty as "Employer"—even though Hall always worked for Key Realty as an independent contractor. The relevant provisions of the agreement can be summarized as follows:

- *WHEREAS clause*: Hall is employed "in a position of trust and confidence, requiring a high degree of loyalty, honesty and integrity" and he "has gained and will continue to gain valuable information and insights on the lines of business in which Employer is engaged; access to Employer's confidential and proprietary information; and exposure to its existing and potential business opportunities";

- *WHEREAS clause*: Hall has accepted his "present position" with the understanding that he "is not to use or divulge any such matters" for his own "personal gain or to the detriment of Employer";

- *Paragraph 1, "TERM"*: The agreement is effective during his employment and for two years after the termination of his employment with Key Realty "for any cause or reason";

- *Paragraph 2, "COVENANT NOT TO COMPETE"*: During his employment, Hall could not, directly or indirectly, compete with Key Realty or "be connected in any like manner with any other business" similar to Key Realty within a thirty-mile radius of his principal place of employment;

48.

- *Paragraph 3, untitled*:  After the termination of his employment, Hall could not, directly or indirectly, compete with Key Realty within a fifty-mile radius of his principal place of employment or "be connected in any like manner with any other business" similar to Key Realty;

- *Paragraph 4, NO DISCLOSURE OR SOLICITATION OF CUSTOMERS*:  Hall could not, directly or indirectly, divulge the names or addresses of any customers of Key Realty unless in response to a subpoena or court order

- *Paragraph 5, NO SOLICITATION OF EMPLOYEES*:  Hall could not, directly or indirectly, "solicit or cause any person under his/her control to solicit any employee of Employer, to terminate his/her employment relationship with Employer."

- *Paragraph 6, INFORMATION*:  Hall could not, during the term of the agreement, "in any fashion, form or manner, either directly or indirectly, divulge, disclose or communicate to any person, firm, or corporation in any manner whatsoever any information of any kind, nature or description concerning any matters affecting or relating to the business of Employer"; and

- *Paragraph 7, RECORDS BELONG TO THE CORPORATION*:  "All books, records, files, forms, reports, accounts and documents relating in any manner to Employers [sic] business or customers, whether prepared by Employee or otherwise coming into Employee's possession, shall be the exclusive property

of Employer and shall be returned immediately to Employer upon termination of employment or upon Employer's request at any time."

{¶ 118} It is undisputed that after Hall signed this agreement with Key Realty in 2012, his responsibilities and business with Key Realty grew exponentially over the years that followed. Degnan testified that from the end of 2012 until Hall left Key Realty, Hall had four main responsibilities: (1) he recruited real estate agents for Key Realty and hired them into the company; (2) he educated and trained Key Realty agents; (3) he "respond[ed] to day-to-day questions, problems, [and] management intervention situations"; and (4) he was responsible for holding people accountable for inappropriate behavior and "dehiring" them, if necessary.

{¶ 119} By the time he left the company in 2019, Hall had multiple Key Realty managers and brokers reporting directly to him, and those managers and brokers oversaw approximately 380 real estate agents. At that time, Key Realty had approximately 1100 agents in total. Hall received a percentage of the revenue that was generated by his group, and he was responsible for paying many of the expenses that were related to his group's business (including paying the managers and brokers who reported to him).

## B. The Formation of Red 1 Realty, LLC

{¶ 120} Although the parties dispute whether Hall and Degnan had any discussions regarding Hall's potential ownership in Key Realty in 2012—i.e., before the non-compete agreement was executed, and before he assumed management responsibilities for Key

Realty—it is undisputed that they had ownership-related discussions after Hall became a manager.

{¶ 121} Hall testified that in "2014-ish," Degnan suggested that they start working on a franchising agreement for him. Degnan testified that these franchise discussions began in 2015. According to Hall, the discussions dragged on for several years, and Degnan changed the form of the would-be ownership arrangement "multiple times." In 2016, Degnan decided against offering Hall a franchise agreement—which, he said, was because of the costs involved with expanding a franchise—and began working on the concept of a "master services agreement" whereby Hall would set up a new LLC, and that new LLC would enter into a management agreement with Key Realty. Degnan testified that he offered this "master services agreement" to Hall in 2018—which, to Degnan, represented "an opportunity to acquire business that I thought was worth millions of dollars"—but Hall declined.

{¶ 122} At that time, Degnan was unaware that Hall had formed a new company—Red 1 Realty, LLC ("Red 1")—two years before Degnan offered the master services agreement. Hall testified that he formed that new LLC in 2016 because he was "unhappy and angry" when Degnan changed his mind about offering a franchising agreement. In his own words, Hall explained that he formed Red 1 because:

> I was promised ownership for years, and that ownership had then
> turned into an offer of a franchise agreement, and then that franchise
> agreement, after years of working on it and getting the circular sent and the

51.

franchise agreement sent, the company decided to move in a different direction and not offer a franchise.

{¶ 123} Hall testified, however, that he was "uncertain if [he] wanted to form a brokerage" when he formed Red 1 in 2016, and just "loved the name Red 1 and [he] wanted to reserve that name." Hall also formed a Red 1 entity in Florida to reserve the name there as well.

### C. Pre-Launch Activities in 2018 and Early 2019 Relating to Red 1

{¶ 124} It is undisputed that the two other individual appellees—Heather Hall and Kenton Fairchild—began activities in 2018 to launch Red 1 as a competing real estate brokerage. Hall denies that he was involved in these activities.

{¶ 125} Heather is Hall's wife. She provided day-to-day administrative support for Hall's Key Realty business—for no compensation—starting in 2015 or 2016. Heather is not, and never has been, a licensed real estate broker or real estate agent.

{¶ 126} On or about October 15, 2018, Hall transferred ownership of Red 1 to Heather. Hall testified that he transferred ownership of Red 1 to his wife because "[s]he asked me to." Hall maintained that the transfer of ownership from him to his wife did not have anything to do with the non-compete contract that he executed in December 2012 with Key Realty. He testified, "I transferred that because my wife said transfer it to me. * * * [W]hen your wife tells you to do something, then sometimes you just do it." When asked whether Heather was aware of his 2012 contract with Key Realty, he answered "[y]ou'd have to ask Ms. Hall."

52.

{¶ 127} Heather testified that she decided to form Red 1 after she "tagged along" with Hall to the Key Realty regional manager meeting in October 2018. She stated that Degnan promised all of the regional managers at that meeting that "he was going to make them owners of Key Realty. He was going to make them millionaires." When he said that, Heather thought to herself "oh my God, he lied. He's not going to do anything. He's breaking every single promise that he promised my husband." She said that made her "think I should start my own brokerage firm." Heather stated she asked Hall if he wanted to start the business with her, and "[h]e said he was unsure if there was a noncompete or whatever." When asked whether Hall transferred ownership of Red 1 to her to avoid the non-compete agreement, she responded, "I asked him to transfer it. But no, I mean, the noncompete that I saw I did not believe was valid. I just wanted to take precautions and keep my family safe." Heather testified that she did not think the agreement was valid because it refers to Hall as an "employee" and because the signature line for Key Realty was blank.

{¶ 128} Kenton Fairchild was an associate broker with Key Realty, where he worked "hand in hand" with Hall. Unlike Hall, Fairchild did not have a non-compete agreement with Key Realty. Degnan testified that in December 2018, he told Hall to "get a noncompete and an intellectual property agreement from Ken Fairchild" but he did not. Hall testified that he actually followed Degnan's instructions: he sent the non-compete agreement to Fairchild on December 14, 2018, and told him to consult with an attorney. Hall denied that he ever told Fairchild that he should not execute the agreement.

53.

{¶ 129} Just a few weeks before that December 14 discussion—on November 28, 2018—Heather and Fairchild met for the first time to discuss the launch of Red 1 as a competing brokerage. Hall was not present for that meeting. At that time, Heather told Fairchild that she was "starting" Red 1, she asked him if he would be interested in being the broker of record for her brokerage, and she offered him an ownership interest in the new company. According to Fairchild, at this initial meeting, Heather told him that "Mike has signed some form of noncompete but neither of them thought it was valid." At his deposition, Fairchild would not say whether the agreement prevented Hall from having an ownership interest in Red 1, and he testified that he "didn't know" why Hall was not an owner. Ultimately, Heather and Fairchild agreed that Heather would own 67 percent of Red 1 and Fairchild would own 33 percent.

{¶ 130} For his part, Hall testified that he merely formed Red 1 as an LLC in 2016—with no specific plans to operate it as a real estate brokerage—and he had "no involvement" in starting or running the brokerage firm. He claimed that "[o]nce it came time to start it, Ken and Heather started running it." There is, however, evidence in the record to the contrary. For example,

- Beth Bick, a Key Realty agent in Florida who reported to Hall, testified that in May or June of 2018, Hall asked her if she "wanted to change the name of the company [in Florida] to Red 1 Realty." She told him no, and there were no further discussions.

54.

- On October 25, 2018—i.e., 10 days after Hall transferred ownership of Red 1 to Heather—Hall emailed Insperity Insurance Services LLC stating "We are looking to add insurance for several dozen to several hundred independent contractors. We are starting a new real estate brokerage firm and would like to differentiate ourselves by offering some type of insurance package."

- In November 2018, a bank account was opened for Red 1 with Heather and Hall as signatories.

- On December 20, 2018, Heather met with Fairchild (their second meeting regarding Red 1), and she provided him with "onboarding documents," including preliminary financial projections. Heather testified that "[she] had created" the documents, but later testified that Hall assisted her in creating the financial projections, stating that "I asked my husband to help me put some numbers on a spreadsheet. Just mainly it was if this scenario, here's some possible expenses that we may incur." Notably, Heather also testified elsewhere that "the bulk of my expertise was primarily supporting the branches with, you know, training, policies and procedures, not doing accounting." And Fairchild testified that he did not review the projected financials for Red 1 to determine if they were reasonable because, he said, "[Heather] knew better than I did"—even though, unlike him, Heather had no real estate experience.

- On January 2, 2019, in another email to Insperity Insurance Services regarding insurance benefits for agents, Hall states, "I am leaving Key Realty on January 10th. I am hoping 100 agents follow me in the first 3 months and another 100 within the first 6 months."

- In January 2019—shortly before his departure from Key Realty—Hall sent out a survey through the Key Realty Columbus Facebook group (over which the parties dispute ownership) asking Key Realty agents what "additional features and benefits" they would like to see in their brokerage. Key Realty agents provided various responses, including free company-provided leads and free centralized showing services. Shortly after the launch of Red 1, those same benefits would be offered as incentives to Key Realty agents as reasons to switch to Red 1.

- On January 9, 2019, Hall discussed Red 1 with two Key Realty agents, Angela Perez and Daniel Perez, and provided draft marketing materials. Hall testified that he discussed Red 1 with these agents because Degnan had instructed him to terminate Key Realty's relationship with them, so he simply "let them know that Key Realty was sending their license back and there would be another option available to them"—i.e., Red 1.

- Hall testified that he left Key Realty on January 10, 2019, because "Heather said she was starting Red 1 Realty that day." According to Heather, she

picked January 10 to start Red 1 because, she said, "I wanted to wait for my husband to get paid out for his December numbers."

{¶ 131} According to Fairchild, he discussed Red 1 with two Key Realty individuals before he left the company. In late December 2018, and early January 2019, he had discussions with Mark Hutchinson, a Key Realty agent and his best friend, about Red 1. At that time, Hutchinson indicated that he would follow Fairchild to Red 1. In addition, on January 8, 2019, he told Carol Sommer, a trainer for Key Realty, that he was going to start a new company that he would like her to join.

**D.  The Launch of Red 1**

{¶ 132} On January 10, 2019, Red 1 officially launched, and Hall and Fairchild separately resigned from Key Realty. On that date, Hall and Fairchild drove together to the Division of Real Estate, and hand-delivered their applications to transfer their licenses to Red 1. Fairchild became the broker of record for Red 1.

{¶ 133} When he left Key Realty on January 10, Hall "unshared" the Key Realty Columbus Facebook group (an online platform used by Key Realty agents for business-related communication) from Key Realty management—which blocked Key Realty's access to that platform as a means to communicate with its agents. Heather then changed the banner in the Facebook group from Key Realty to Red 1. On that same date, Hall also blocked, or "unshared," various Google drive accounts from Key Realty management, blocking access to any documents that he created while performing work for Key Realty, including "[p]resentations, spreadsheets, Google Drive docs, Exel [sic] sheets, lots of

57.

different types of documents." He also blocked Key Realty management from access to the general email for his Key Realty office, keyrealtycolumbus@gmail.com, and similar gmail accounts for Key Realty Cincinnati, Dayton, Cleveland, Akron, and Sarasota. Hall maintains that all of these actions are justified because he created these online platforms, documents, accounts, and information for his own independent company—Key Realty Columbus 1, LLC—through which he performed his work for Key Realty as an independent contractor, not an employee.

{¶ 134} At 2:32 pm on January 10, 2019, Hall emailed Degnan and Saylor stating:

I wish to rescind any noncompete that I may have signed in the past. If I did sign a non-compete, I never received a signed copy from you. Due to contract law, dispatch and delivery did not occur regarding a bilateral contract.

In addition, I would like to offer many items of consideration in an effort to reach a written mutual release of agreement. Please see the attached termination agreement and release for consideration.

{¶ 135} Attached to his email was a draft "Termination of Agreement and Release," through which Hall proposed that Key Realty terminate the non-compete and fully release all claims that it may have against Hall arising out of the non-compete agreement. As consideration, Hall offered to (1) transfer ownership of Key Realty One Florida to Degnan; (2) transfer ownership of JoinKeyRealty.com to Degnan; (3) sign an agreement stating that neither he nor any family members would operate a brokerage firm

58.

in Toledo; (4) turn over ownership of the various gmail accounts, (5) turn over ownership of Facebook groups, (6) turn over leases, and (7) "work with Key Realty through transition."

{¶ 136} At 8:55 p.m. on January 10, 2019, Fairchild posted in the former Key Realty Columbus Facebook group—which had been unshared with Key Realty management and renamed the "Red 1 Realty" group—in which he stated the following:

> * * * Effective immediately, Heather Hall and I have started a new brokerage, Red 1 Realty, and Mike has also joined us. We will offer the same commission plan you are accustomed to as well as a new option. In addition to the tools you already have, we will also provide Company Leads and CSS at no cost to our agents, Commercial Training, online options for weekly training, additional assistance with KV Core and more. * * * [W]e will be having a Grand Opening at the office on Saturday from 6-9p with food & drinks if you would like to attend. * * *

{¶ 137} On January 12, 2019, appellees hosted the Red 1 grand opening event at the former Key Realty Columbus office. Appellees invited only Key Realty agents to this event. At the event, Hall presented to the Key Realty agents using a power point presentation that he and Fairchild created. The power point states that appellees left Key Realty due to, among other things, "[b]roken promises to management and agents." The document also highlights differences between Red 1 and Key Realty, including company-provided leads, easier Dotloop approval/shorter checklist, free CSS, commercial training

59.

and assistance, and "more to follow – health benefits, credit cards." Key Realty maintains that many of these items were identified in the January 2019 survey that Hall sent to Key Realty agents in the days before his departure. The Red 1 power point also includes an "easy transition offer," which would end on February 15, in which Red 1 offered to pay transfer fees and take transfer applications to the Division of Real Estate for Key Realty agents, replace their business cards, replace two signs, and honor their anniversary dates.

{¶ 138} At Red 1, Hall provided commercial real estate training for Red 1 agents, and Fairchild provided residential real estate training. Hall testified, however, that he has not received any payments from Red 1 whatsoever, and there is no "formalized plan" for him to be paid for any work that he does for the company as an independent contractor.

{¶ 139} According to Degnan, Key Realty lost approximately 200 agents in the Columbus area and suffered other damages due to appellees' conduct.

### E. The Current Litigation

{¶ 140} On January 15, 2019, Key Realty filed this case against Hall, Heather, Fairchild, and Red 1, along with a motion for temporary restraining order and preliminary injunction. The next day, the trial court held a hearing on Key Realty's motion for temporary restraining order. At the conclusion of the hearing, the trial court ordered Hall, among other things, to return various documents and online platforms—including the Key Realty Columbus Facebook page—to Key Realty.

{¶ 141} The very same day, between 4:30 p.m. and 5:21 p.m., Heather deleted many posts from the Facebook page. When asked in her deposition why she removed these posts on January 16, 2019, she responded "I really can't recall," "I don't know," and "I can't remember."

## II. Breach of Contract (against Hall)

{¶ 142} In the amended complaint, Key Realty alleges that Hall breached the non-compete agreement by (1) directly competing with Key Realty, (2) soliciting Key Realty agents and customers, (3) using and disclosing Key Realty's confidential information, and (4) failing to return all books, records, and other materials that relate to Key Realty's business or customers upon his termination. The trial court concluded that there are genuine issues of material fact regarding whether Hall violated the agreement by competing with Key Realty, soliciting Key Realty agents and customers, and failing to return all Key Realty-related materials upon his termination—thereby precluding summary judgment on those parts of Key Realty's contract claim. The trial court granted summary judgment to Hall on the remaining aspect of Key Realty's breach-of-contract claim—i.e., Hall's alleged use and disclosure of confidential information. On appeal, Key Realty argues that part of the trial court's order was error. I agree.

{¶ 143} The majority, however, does not reach the merits of Key Realty's argument. Instead, it declares the entire non-compete agreement void for lack of consideration and, on that basis, reverses in part, affirms in part, and grants summary judgment to Hall on the entire breach-of-contract claim. The majority concludes that Key

61.

Realty failed to "provide Mr. Hall with proper consideration" when he signed the non-compete agreement because he "was never appellant's employee and was never appellant's co-owner" and, therefore, "[a]t most it appears appellant offered a gratuitous promise as consideration." In my view, the majority's analysis turns well-established contract law on its head—in several respects.

{¶ 144} First, it is irrelevant that Hall was "never appellant's employee." As the Supreme Court of Ohio has recognized, non-compete agreements may be executed outside the employer-employee relationship and non-competes that are executed by independent contractors can be enforceable. *Hamilton Ins. Serv., Inc. v. Nationwide Ins. Cos.*, 86 Ohio St.3d 270, 714 N.E.2d 898 (1999) (enforcing a non-compete clause in a corporate agency agreement between Nationwide and an independent contractor). Moreover, although the parties used the terms "Employee" and "Employer" to refer to themselves in the non-compete agreement—i.e., the contract provides that it is by and between "Mike Hall * * * (hereinafter 'Employee') and Key Realty, Ltd. (hereinafter referred to as 'Employer')"—those are merely defined terms for purposes of the contract and, therefore, have no legal significance.

{¶ 145} Second, the record contains no evidence that Hall's independent-contractor relationship with Key Realty had a specific term of duration, and "employment with no specific term of duration gives rise to an employment-at-will relationship, regardless of whether the underlying relationship is one of employer-employee or employer-independent contractor." *Americare Healthcare Servs. LLC v. Akabuaku,*

62.

10th Dist. Franklin No. 10AP-777, 2010-Ohio-5631, ¶ 24. Hall's relationship with Key Realty was therefore an employment-at-will relationship, even though the underlying relationship was employer-independent contractor.

{¶ 146} Third, "[c]onsideration exists to support a noncompetition agreement when, in exchange for the assent of an at-will employee to a proffered noncompetition agreement, the employer continues an at-will employment relationship that could legally be terminated without cause." *Lake Land Emp. Group of Akron, LLC v. Columber*, 101 Ohio St.3d 242, 2004-Ohio-786, 804 N.E.2d 27, ¶ 20. Given that "[t]he record contains no evidence of any contract, written or oral, setting forth * * * a term of duration for appellant's services[,] * * * the parties' relationship was at-will. Thus, appellant's independent contractor status does not diminish the applicability of the *Lake Land* holding." *Americare* at ¶ 24 (finding that non-compete between employer and independent contractor was supported by consideration because the contractor "continued to perform services" for the employer after the execution of the agreement); *see also Financial Dimensions, Inc. v. Zifer*, 1st Dist. Hamilton No. C-980960, 1999 WL 1127292, *4 (Dec. 10, 1999) (finding that the employer's "continuation of the parties' relationship was sufficient consideration to support Zifer's agreement to the provisions in the covenant not to compete" and Zifer's status as an independent contractor, rather than an at-will employee, was "not relevant to the issue under consideration").

{¶ 147} Here, it is undisputed that Hall and Key Realty continued their at-will relationship for six years after Hall executed the non-compete agreement in 2012.

63.

Because there is no evidence in the record to suggest that either party was required to continue their relationship for any period of time, the continuation of their employer-independent contractor relationship went beyond what either party was otherwise obligated to do, and therefore constituted sufficient consideration for the non-compete agreement that Hall signed.

{¶ 148} The majority concludes differently, relying upon Hall's testimony that he signed the non-compete agreement "on the future promise of ownership," which never occurred. But, even if this "future promise" is assumed to be true, it is not relevant to the enforceability of the agreement. As discussed, the contract is nonetheless supported by consideration under Ohio law given the continuation of their at-will relationship.

{¶ 149} Moreover, the written contract does not include a "future promise of ownership." Instead, the contract expressly provides that the parties' agreement is "in consideration of *the mutual promises contained herein*, and for other good and valuable consideration, including _____, the receipt of which and the sufficiency of which are hereby acknowledged." (Emphasis added.) The majority states that the agreement has "a blank line where the description of the consideration should go," but ignores the preceding language stating that the agreement is "in consideration of the mutual promises contained herein." Although not specifically labeled as a "promise" from Key Realty in the agreement, the contract specifically states that Hall will "gain valuable information and insights on the lines of business in which Employer is engaged; access to Employer's confidential and proprietary information; and exposure to its existing and potential

64.

business opportunities." In exchange, Hall promised that he would not compete against Key Realty, solicit its customers or employees, or use its business information. Accordingly, the written contract contains a bargained-for benefit and detriment, fully satisfying the general definition of consideration in Ohio. *Kostelnick v. Helper*, 96 Ohio St.3d 1, 2002-Ohio-2985, 770 N.E.2d 58, ¶ 16, quoting *Perlmuter Printing Co. v. Strome, Inc.*, 436 F.Supp. 409, 414 (N.D.Ohio 1976) (stating that consideration is "the bargained for legal benefit and/or detriment").

{¶ 150} Finally, even though Hall denied that he signed the non-compete in 2012 because he was being promoted to manager (and claimed that the agreement was signed "on the future promise of ownership" instead) there is plenty of evidence in the record to create a genuine dispute of fact on that issue, to the extent that it is relevant. That is, the record shows that Hall's execution of the non-compete agreement in 2012 coincided with the termination of his employment with Old Republic Home Warranty and promotion into a management position with Key Realty. As Degnan testified, Hall was "untested as a manager" in 2012. For that reason, Degnan maintains that it would have been "ridiculous" to have offered an ownership interest to Hall at that time. In my view, the ultimate factfinder should determine the respective credibility of Degnan and Hall on this issue.

{¶ 151} For all these reasons, I believe that the non-compete agreement is supported by consideration and fully enforceable.

65.

{¶ 152} Turning to the merits of Key Realty's argument on appeal, it argues that there is a genuine dispute of material fact regarding whether Hall breached his obligations under paragraph 6 of the agreement, which provides that Hall cannot directly or indirectly disclose "any information of any kind * * * concerning any matters affecting or relating to the business of Employer" including, without limitation, any information regarding "its plans, processes, work in process or any other data of any kind * * * without regard to whether any or all of the foregoing matters would be deemed confidential, material, or important."

{¶ 153} The trial court concluded that although there is evidence that Red 1 had information regarding Key Realty—most notably, the results of the survey that Hall sent to Key Realty agents in January 2019, which were later offered by Red 1 as incentives to Key Realty agents to get them to switch companies—"there is nothing in the record to indicate that they got this information from Michael Hall."  To the contrary, there is evidence in the record that could lead a reasonable factfinder to conclude that Hall sent the survey to Key Realty agents in January 2019 *precisely because* he intended to gather information for Red 1 to use to solicit Key Realty agents.  Indeed, the timing and content of the survey itself is circumstantial evidence of this.  That is, just a few days before he departed Key Realty for Red 1, Hall sent a survey to Key Realty agents to determine "[w]hat additional features and benefits" those agents would "like from [their] brokerage."  And, two days after he left Key Realty, the information gathered through those survey responses appears in a power point presentation—jointly prepared by Hall

66.

and Fairchild—that was used at the Red 1 grand opening to convince Key Realty agents to switch to Red 1. This evidence is sufficient to create a genuine dispute of material fact regarding Hall's breach of paragraph 6 of the non-compete agreement.

{¶ 154} I would, therefore, reverse the trial court's decision to the extent that it grants summary judgment to Hall on Key Realty's claim that Hall used and/or disclosed information related to its business in contravention of the non-compete agreement. In addition, I would affirm that portion of the trial court's judgment that found genuine issues of material fact relating to the remainder of Key Realty's breach-of-contract claim against Hall. In my view, the record—as outlined in my fact section above—demonstrates the existence of questions of fact relating to this entire claim.

### III. Tortious Interference with Contract (against Red 1, Heather, and Fairchild)

{¶ 155} Key Realty asserted a claim against Red 1, Heather, and Fairchild for tortious interference with contract, alleging that those appellees permitted, caused, encouraged and/or induced Hall's breach of his non-compete agreement. The trial court granted summary judgment to appellees on this claim because "Michael Hall made his own decision to stop working for plaintiff as an independent contractor." The majority concludes that this claim fails as a matter of law because the underlying contract is void for lack of consideration. In my view, there are genuine disputes of material fact regarding whether appellees tortiously interfered with Hall's non-compete agreement— which, as I explain above, is valid and enforceable.

67.

{¶ 156} The elements of tortious interference with contract are (1) the existence of a contract, (2) the wrongdoers' knowledge of the contract, (3) the wrongdoers' intentional procurement of the contract's breach, (4) lack of justification, and (5) resulting damages. *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 85 Ohio St.3d 171, 707 N.E.2d 853 (1999), paragraph one of the syllabus.

{¶ 157} Here, a non-compete agreement exists between Hall and Key Realty. Heather and Fairchild both testified that they were aware of the agreement, and that they discussed the agreement to some degree at their initial meeting regarding Red 1. Although Heather testified that she did not think the agreement was valid, and Fairchild would not say whether the agreement prevented Hall from having an ownership interest in Red 1 and testified that he "didn't know" why Hall was not an owner of Red 1, their credibility on those issues should be weighed by the ultimate factfinder. Indeed, a reasonable factfinder could conclude that the circumstances surrounding the inception and structure of Red 1—i.e., that it was transferred from Hall to Heather in October 2018, and that Fairchild owns only one-third of the company while Heather owns two-thirds of the company despite her lack of real estate experience—demonstrates that they were attempting to end run Hall's obligations to Key Realty under his non-compete from the beginning.

{¶ 158} This evidence could also be interpreted by a reasonable factfinder as tending to show that the appellees intentionally procured Hall's breach. Although the trial court found it to be dispositive that Hall made "his own decision" to leave Key

Realty, that fact is immaterial for purposes of this claim. Key Realty does not allege that Hall breached his agreement by leaving Key Realty—it alleges that Hall breached his agreement by competing with Key Realty by, among other things, soliciting its agents to Red 1, sharing its confidential information with Red 1, and training Red 1 agents. There is testimony and evidence in the record that, if believed (or not believed, as the case may be), demonstrates that these appellees worked with Hall to establish Red 1 as a competing brokerage, and that they carefully and deliberately structured Red 1 in a manner that was designed to avoid Hall's non-compete agreement with Key Realty.

{¶ 159} For these reasons, I would reverse summary judgment on Key Realty's claim against Red 1, Heather, and Fairchild for tortious interference with contract, and remand that claim to the trial court for further proceedings.

{¶ 160} But, to the extent that Key Realty's claim for tortious interference with contract includes an allegation that all appellees interfered with "Key Realty's contractual relationships with its agents and other contractual partners," I agree with the majority that summary judgment is warranted on that part of the claim. As the majority recognizes, there is no evidence regarding the existence of any binding contracts between Key Realty and those agents that were solicited to join Red 1.

**IV. Tortious Interference with Business Relations (against all appellees)**

{¶ 161} Key Realty alleges that appellees tortiously interfered with Key Realty's business relationships with its agents. The majority affirms summary judgment on this claim, finding (1) "appellant is limited to an action for breach of contract against Mr.

69.

Hall, and may not also recover for tortious interference with business relations," and (2) Key Realty failed to put forth clear and convincing evidence that appellees acted with malice, and noting that "soliciting for real estate agents from other firms is a common industry practice and actively occurred on behalf of Red 1 Realty, LLC after each appellee severed his/her relationship with appellant." I disagree with both findings.

{¶ 162} First, it is true that where the defendant's breach of contract "necessarily interferes with the injured party's business relations with third parties," the injured party is generally limited to an action for breach of contract. *Digital & Analog Design Corp. v. North Supply Co.*, 44 Ohio St.3d 36, 46, 540 N.E.2d 1358 (1989). But, "[a]n exception exists, and a tort action may lie, only where the breaching party indicates, by his breach, *a motive to interfere with the adverse party's business relations* rather than an interference with business as a mere consequence of the breach." *Id.*; *see also Universal Windows & Doors, Inc. v. Eagle Window & Door, Inc.*, 116 Ohio App.3d 692, 700, 689 N.E. 2d 56 (1st Dist.) (recognizing that a party can maintain both a breach of contract claim and a tortious interference with business relations claim if (1) there is a motive to interfere with the injured party's business relations and (2) the interference is not "merely incidental to the breach.").

{¶ 163} Here, there is enough evidence in the record to create a genuine dispute as to whether Hall had a "motive to interfere with the adverse party's business relations." For example, Hall stated, just a few days before he left Key Realty, that "I am hoping 100 agents follow me in the first 3 months and another 100 within the first 6 months." That

70.

statement could be viewed by a reasonable factfinder as evidence that Hall had a distinct motive to raid Key Realty's agents in the Columbus area for the benefit of Red 1 and, therefore, any interference with Key Realty's agent relationships was not merely incidental to any breach of his non-compete agreement.

{¶ 164} Moreover, considering the general elements of this tort, I believe there is a question of fact regarding whether all appellees tortiously interfered with Key Realty's agent relationships. This tort requires (1) the existence of a business relationship, (2) the wrongdoer's knowledge thereof, (3) an intentional interference causing a termination of that relationship, and (4) resulting damages. *Wauseon Plaza Ltd. Partnership v. Wauseon Hardware Co.*, 156 Ohio App.3d 575, 2004-Ohio-1661, 807 N.E.2d 953, ¶ 57 (6th Dist.). Although the interference must be done with actual malice, "[a]ctual malice in a tortious interference claim is not ill-will, spite, or hatred; rather, it denotes an unjustified or improper interference with the business relationship." *Chandler & Assocs., Inc. v. Am.'s Healthcare Alliance, Inc.*, 125 Ohio App.3d 572, 583, 709 N.E.2d 190 (8th Dist.1997). Where the alleged wrongdoer and the injured party are competitors, any interference is privileged (and therefore not actionable) if (1) the relation concerns a matter of competition between them, (2) the actor does not use "improper means" to interfere, (3) the actor does not intend to create or continue an illegal restraint of competition, and (4) the actor's purpose is at least in part to advance his own competitive interests. *MedCorp., Inc. v. Mercy Health Partners*, 6th Dist. Lucas No. L-08-1227, 2009-Ohio-988, ¶ 43-48.

71.

{¶ 165} Here, the record demonstrates that appellees intentionally interfered with Key Realty's business relationships by soliciting its agents to join Red 1, and that Key Realty suffered damages as a result. The only question is whether appellees used "improper means" to intentionally interfere with these relationships—if so, their conduct was not privileged competition.

{¶ 166} In my view, based on all the evidence in the record, a reasonable factfinder could conclude that appellees used "improper means" to interfere with Key Realty's agent relationships. For example, a factfinder could conclude that, pursuant to the terms of Hall's non-compete agreement, Key Realty owned the Facebook group and the other online platforms that appellees commandeered to directly solicit Key Realty's agents. Indeed, Hall agreed in the non-compete agreement that "*all* books, *records, files,* forms, reports, *accounts* and documents" relating to Key Realty's business—including any such items that were "prepared by" Hall himself—are "the exclusive property" of Key Realty. If these items are found to be Key Realty's "exclusive property," then a factfinder could also conclude that it was improper for appellees to use the Facebook account and other online platforms—to the complete exclusion of Key Realty management—to communicate with and solicit Key Realty agents. For that reason alone, I believe that summary judgment on this claim should be reversed.

### V. Misappropriation of Trade Secrets (against all appellees)

{¶ 167} "To maintain a cause of action for disclosure of trade secrets, plaintiffs must establish: (1) ownership of an existing trade secret, (2) acquisition by defendants of

the trade secret through a confidential relationship and (3) unauthorized use or disclosure of the trade secret." *Inergystics, Inc. v. Fairbairn*, 6th Dist. No. L-80-029, 1981 WL 5578, * 4 (May 15, 1981). Like the trial court, the majority concludes that even if Key Realty could establish that its information is a trade secret as defined by R.C. 1331.61(D), Key Realty failed to establish the third element of this claim—unauthorized use or disclosure of the alleged trade secrets. I disagree with that reasoning. In my view, there is plenty of evidence in the record to create a genuine issue of material of fact regarding whether the appellees used or disclosed Key Realty's information.

{¶ 168} To me, the real problem is that the record lacks evidence that the Key Realty information that appellees may have used or disclosed was truly a "trade secret." Under R.C. 1331.61(D), a "trade secret" must (1) derive independent economic value from not being known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) be the subject of reasonable efforts to maintain its secrecy. Here, there is very little evidence that Key Realty made any reasonable efforts to maintain the secrecy of its purported trade secret information.

{¶ 169} In their summary judgment motion, appellees argued that most of Key Realty's purported "trade secrets" are publicly available on the internet, and Key Realty did not adequately refute this contention. Although Degnan testified that at least some of Key Realty's training information is contained on "protected areas" of the website, he did not provide any specifics regarding *how* such training materials are "protected" in those

73.

"areas." Degnan also testified that, in his view, even publicly-available Key Realty material—including information on Key Realty's website and YouTube videos—should be protected as a trade secret. This position is not supported by Ohio law.

{¶ 170} For this reason, I agree with the majority's ultimate conclusion that summary judgment on Key Realty's claim for misappropriation of trade secrets should be affirmed.

## VI. Unfair Competition (against all appellees)

{¶ 171} The majority affirms summary judgment to appellees on the unfair competition claim, finding that Key Realty "fails to show where in the record appellees designed the launch of Red 1 Realty, LLC with malice towards appellant to cause harm, other than appellant's own speculations." In my view, the issue of whether appellees acted with malice to harm Key Realty is a disputed issue of material fact, and there is more than enough evidence in the record—when viewed in a light most favorable to Key Realty—that is sufficient to survive summary judgment.

{¶ 172} "Unfair competition ordinarily consists of representations by one person, for the purpose of deceiving the public, that his goods are those of another. * * * The concept of unfair competition may also extend to unfair commercial practices such as malicious litigation, circulation of false rumors, or publication of statements, all designed to harm the business of another." *Water Mgmt., Inc. v. Stayanchi*, 15 Ohio St.3d 83, 85, 472 N.E.2d 715 (1984); *see also Microsoft Corp. v. Action Software*, 136 F.Supp.2d 735, 740 (N.D.Ohio 2001), quoting Ohio Jurisprudence 3d, Trade Regulations, Section 66

74.

(1989) (recognizing that unfair competition "has come to develop a broader connotation in recent years").  To the extent that the "circulation of false rumors" may form the basis of the claim, summary judgment is appropriate where "no competent evidence has been presented which creates a question of fact as to whether [defendants] circulated false rumors, or published statements designed to harm [plaintiff's] business."  *Molten Metal Equip. v. Metaullics Systems Co.*, 8th Dist. Cuyahoga No. 76407, 2000 WL 739470, *5 (June 8, 2000).

{¶ 173} Here, at a minimum, Key Realty has presented competent evidence that creates a question of fact as to whether appellees circulated false rumors and published statements that were designed to harm Key Realty's business.  That is, the power point presentation that was used at the Red 1 grand opening event to solicit Key Realty agents to join Red 1, states that Key Realty had made "broken promises" to agents.  Heather was asked at her deposition to identify any of these "broken promises," but she could not:

Q:  So can you identify any specific broken promise that was made to a specific agent?

A:  I can't per se.

{¶ 174} Moreover, in my view, all of the evidence—as summarized above—should be weighed by the ultimate factfinder to assess witness credibility and thereby determine appellees' true intentions.  The trial court and the majority conclude that appellees were not engaged in unfair competition, as a matter of law, because "they were also simultaneously competing with all other real estate brokerage services companies."

But the factfinder should have the opportunity to weigh that fact against the other evidence in the record—for example, Hall's statement that he hoped that "100 agents" from Key Realty would follow him to Red 1 "within 3 months" and "another 100 within the first 6 months"—to determine whether appellees engaged in unfair competition by soliciting Key Realty agents through the use of any false rumors or published statements that were intended to harm Key Realty.

{¶ 175} For these reasons, I would reverse summary judgment on the claim for unfair competition and remand for further proceedings.

## VII. Breach of Fiduciary Duty (against Hall)

{¶ 176} In the amended complaint, Key Realty asserted a breach of fiduciary duty claim against all appellees. The trial court granted summary judgment on this claim to appellees. On appeal, Key Realty argues that it was error for the court to dismiss its claim against Hall, specifically, for breach of fiduciary duty. I agree.

{¶ 177} A "fiduciary relationship" is one "in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust." *Hope Academy Broadway Campus v. White Hat Mgt., LLC*, 145 Ohio St.3d 29, 2015-Ohio-3716, 46 N.E.3d 665, ¶ 43, quoting *In re Termination of Emp. of Pratt*, 40 Ohio St.3d 107, 115, 321 N.E.2d 603 (1974). "The determination concerning what constitutes a confidential (fiduciary) relationship is a question of fact dependent upon the circumstances of each case." *B-G Leasing Co. v. First Nat'l Bank*, 6th Dist. Huron

76.

No. H-89-56, 1991 WL 87113, * 3 (May 4, 1999), quoting *Indermill v. United Savings*, 5 Ohio App.3d 243, 245, 451 N.E.2d 538 (9th Dist.1982). Generally, there is no fiduciary relationship between an employer and an independent contractor "unless both parties understand that that relationship is one of special trust and confidence." *Northeast Ohio College of Massotherapy v. Burek*, 144 Ohio App.3d 196, 204, 759 N.E.2d 869, 875 (7th Dist.2001). "A fiduciary duty may arise out of a contract or an informal relationship," so long as both parties "understand that a special trust of confidence has been reposed." *M.S. v. Toth*, 2017-Ohio-7791, 97 N.E.3d 1206, ¶ 27 (9th Dist.), quoting *RPM, Inc. v. Oatey Co.*, 9th Dist. Medina Nos. 3282-M, 2005-Ohio-1280, ¶ 19.

{¶ 178} In my view, whether Hall owed any fiduciary duties to Key Realty is a question of fact that cannot be resolved on summary judgment. Although Hall worked for Key Realty as an independent contractor, he signed a contract acknowledging that Key Realty was placing him "in a position of trust and confidence, requiring a high degree of loyalty, honesty, and integrity," and he agreed that he would not "use or divulge" any of Key Realty's business-related information for his own "personal gain" or "to the detriment of" Key Realty. According to Degnan, the realities of their relationship demonstrated that Hall maintained a position of trust and confidence. Hall, on the other hand, when asked whether he was placed within a position of trust and confidence at Key Realty, responded "[s]ometimes yes and sometimes no."

{¶ 179} Given the evidence in the record, especially the explicit language of the contract that Hall signed, I believe a genuine dispute of material fact exists regarding

77.

whether Hall owed any fiduciary duties to Key Realty that he breached through his conduct related to Red 1.

## VIII. Spoliation (against all appellees)

{¶ 180} Key Realty contends that appellees spoliated evidence when they deleted posts and removed group members from the Key Realty Columbus Facebook page. In support of their spoliation claim, Key Realty offered as an exhibit a log printed from the Facebook page. It shows that on the day the trial court ordered Hall to return control of the page to Key Realty (the day after the action was filed), Heather—before returning control to Key Realty—deleted 19 posts (including posts by Hall and Fairchild) and removed numerous individuals from the group.

{¶ 181} Heather described the Facebook page as a forum for agents to ask questions and she conceded that she, Fairchild, and her husband had responded to questions posed by agents on the page. Heather denied that she deleted the posts to conceal the fact that they had recruited Key Realty agents to work for Red 1, but she claimed that she could not remember the content of the posts she deleted or why she deleted them. She acknowledged that she was aware that the lawsuit, including the TRO, had been filed.[4]

---

[4] Heather claimed in a September 10, 2019 affidavit that she first learned that a TRO had been granted sometime after 5:30 p.m. on January 16, 2019—after she finished purging Facebook posts—and she was not initially named in the suit. Significantly, she does not deny that she was aware that the litigation had been initiated against her husband and Red 1 (which she co-owned) and that control of the Key Realty Facebook page was at issue in the litigation.

{¶ 182} The majority concludes that appellees are entitled to summary judgment on Key Realty's spoliation claim because Key Realty failed to show that appellees engaged in willful destruction of evidence designed to disrupt Key Realty's case, that the destruction of evidence disrupted Key Realty's case, or that Key Realty suffered damages as a result of the destruction of evidence.

{¶ 183} As the majority correctly states, under Ohio law, "[a] cause of action exists in tort for interference with or destruction of evidence." *Smith v. Howard Johnson Co.*, 67 Ohio St.3d 28, 615 N.E.2d 1037 (1993). "The elements of a claim for interference with or destruction of evidence are (1) pending or probable litigation involving the plaintiff, (2) knowledge on the part of defendant that litigation exists or is probable, (3) willful destruction of evidence by defendant designed to disrupt the plaintiff's case, (4) disruption of the plaintiff's case, and (5) damages proximately caused by the defendant's acts." *Id.*

{¶ 184} Here, litigation had been initiated against Hall and Red 1—a company that Heather co-owned. Heather was aware of the litigation—she was the statutory agent for Red 1 and her husband was a defendant. Thus, the first two elements of the claim are easily satisfied. It is primarily the third, fourth, and fifth elements at issue here.

{¶ 185} As to the third element, willful destruction designed to disrupt the plaintiff's case, to prove this element, a plaintiff must show that a defendant willfully destroyed evidence. *See, generally, Elliott-Thomas v. Smith*, 154 Ohio St.3d 11, 2018-Ohio-1783, 110 N.E.3d 1231. Willfulness "'reflects an intentional and wrongful

79.

commission of the act.'" *Heimberger v. Zeal Hotel Group, Ltd.*, 2015-Ohio-3845, 42 N.E.3d 323, ¶ 37 (10th Dist.), quoting *White v. Ford Motor Co.*, 142 Ohio App.3d 384, 387, 755 N.E.2d 954 (10th Dist.2001).

{¶ 186} Here, Heather testified that to remove the Facebook posts and group members, she pressed the "delete" button; she believes that once deleted, a post cannot be retrieved. While she denied that her purpose was to conceal evidence that she or her husband solicited Key Realty agents to work for Red 1, she said that she does not know why she did it. I would conclude that this testimony creates a genuine issue of material fact as to whether Heather willfully destroyed evidence. *See Abbott v. Marshalls of MA, Inc.*, 8th Dist. Cuyahoga No. 87860, 2007-Ohio-1146, ¶ 25 (finding "willful destruction" element met where employee taped over video footage depicting purported shoplifting incident in violation of store policy, noting that such conduct did not appear to be "merely coincidental"). I agree with the majority, however, that no evidence was offered that Hall or Fairchild destroyed evidence and summary judgment was properly granted in their favor.

{¶ 187} As to the elements of disruption and damages, I agree with Key Realty that Heather failed to meet her burden of establishing that no genuine issue of material fact exists. Heather's summary-judgment motion stated only as follows:

> The evidence now before this court establishes beyond genuine dispute that none of the Red 1 Defendants can be held liable for the tort of spoliation of evidence. Heather Hall and Ken Fairchild testified in their

80.

depositions that they did nothing that constitutes the tort of spoliation of evidence. And there is no evidence to the contrary.

{¶ 188} The Ohio Supreme Court in *Dresher v. Burt*, 75 Ohio St.3d 280, 293, 662 N.E.2d 264 (1996) held that "a party seeking summary judgment, on the ground that the nonmoving party cannot prove its case, bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims." The court explained that "[t]he moving party cannot discharge its initial burden under Civ.R. 56 simply by making a conclusory assertion that the nonmoving party has no evidence to prove its case. Rather, the moving party must be able to specifically point to some *evidence* of the type listed in Civ.R. 56(C) which affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claims." (Emphasis in original.) *Id.* "If the moving party fails to satisfy its initial burden, the motion for summary judgment must be denied."

{¶ 189} Here, there is evidence that Heather willfully destroyed evidence, and she offered only conclusory assertions to dispute the remaining elements of Key Realty's spoliation claim. I would find that these conclusory assertions are insufficient to entitle her to summary judgment.

### IX. Conversion (against all appellees)

{¶ 190} In its amended complaint, Key Realty asserted a claim for conversion of its Facebook page, email accounts, websites, calendars, and Google Drive resources.

This claim is premised on appellees' conduct in altering administrative privileges, expelling Key Realty owners from Key Realty's central Ohio forums, and blocking owners and directors from those materials and accounts. The trial court granted summary judgment to appellees on this claim, reasoning that Key Realty failed to demand that appellees return the property. The majority affirms on this basis.

{¶ 191} To prevail on a claim for conversion, a plaintiff must prove "(1) plaintiff's ownership or right to possession of the property at the time of conversion; (2) defendant's conversion by a wrongful act or disposition of plaintiff's property rights; and (3) damages." *6750 BMS, L.L.C. v. Drentlau*, 2016-Ohio-1385, 62 N.E.3d 928, ¶ 28 (8th Dist.). If the defendant came into possession of the property lawfully, the plaintiff must also prove "(1) that the plaintiff demanded the return of the property after the defendant exercised dominion or control over the property; and (2) that the defendant refused to deliver the property to the plaintiff." *Id.* Because appellees came into possession of the property lawfully, the trial court concluded that Key Realty was required—but failed—to prove these additional elements.

{¶ 192} Key Realty argues that this was error because a trial court may not award summary judgment on a ground not specified in the motion for summary judgment. It cites *State ex rel. Sawicki v. Court of Common Pleas of Lucas Cty.*, 121 Ohio St.3d 507, 2009-Ohio-1523, 905 N.E.2d 1192, ¶ 27 (2009). There, the Ohio Supreme Court recognized that "'[i]t is reversible error to award summary judgment on grounds not specified in the motion for summary judgment.'" *Id.*, citing *Patterson v. Ahmed*, 176

82.

Ohio App.3d 596, 2008-Ohio-362, 893 N.E.2d 198, ¶ 14 (6th Dist.).  The court explained that by relying on an unargued ground for granting summary judgment, the non-movant is denied a meaningful opportunity to respond.  *Id.  See Mitseff v. Wheeler*, 38 Ohio St.3d 112, 526 N.E.2d 798 (1988), syllabus ("A party seeking summary judgment must specifically delineate the basis upon which summary judgment is sought in order to allow the opposing party a meaningful opportunity to respond").

{¶ 193} I agree with Key Realty.  Appellees in their motions argued that they were entitled to summary judgment on Key Realty's conversion claim because the property at issue belonged to Key Realty Columbus 1, LLC, owned solely by Hall.  Appellees did not argue that Key Realty failed to establish that it had demanded return of the property.  As such, Key Realty was denied a meaningful opportunity to refute the conclusion reached by the court.

{¶ 194} Additionally, as to the arguments that were raised by appellees, I would find that paragraph 7 of the non-compete agreement—which provides that "all books, records, files, forms, reports, accounts and documents relating in any manner to [Key Realty's] business or customers, whether prepared by [Hall] or otherwise coming into [Hall's] possession, shall be the exclusive property of [Key Realty] and shall be returned immediately to [Key Realty] upon termination of employment * * *"—belies Hall's claim of ownership and, at the very least, creates a genuine issue of material fact precluding summary judgment.  I would, therefore, reverse the trial court judgment granting summary judgment to appellees on Key Realty's conversion claim.

## X.  Alleged Criminal Acts

{¶ 195} R.C. 2307.60(A)(1) provides that "[a]nyone injured in person or property by a criminal act has, and may recover full damages in, a civil action unless specifically excepted by law * * *."  *See Jacobson v. Kaforey*, 149 Ohio St.3d 398, 2016-Ohio-8434, 75 N.E.3d 203, ¶ 10 ("R.C. 2307.60(A)(1), by its plain and unambiguous terms, creates a statutory cause of action for damages resulting from any criminal act.").  Proof of an underlying criminal conviction is not required to maintain an action under R.C. 2307.60.  *Buddenberg v. Weisdack*, Slip Opinion No. 2020-Ohio-3832.

{¶ 196} Key Realty asserts civil claims for the following criminal conduct that it claims appellees committed:  (1) unauthorized use of computer, cable, or telecommunication property, a violation of R.C. 2913.04(A) or (B); (2) criminal mischief, a violation of R.C. 2909.07(A)(6)(a); (3) theft; and (4) extortion, a violation of R.C. 2905.11(A)(1).  The majority affirms the trial court judgment granting summary judgment in favor of appellees on all of Key Realty's claims premised on violations of criminal statutes.  As explained below, I disagree, in part.

### A.  Unauthorized Use of Computer Property (against all appellees)

{¶ 197} Under R.C. 2913.04 (A), "[n]o person shall knowingly use or operate the property of another without the consent of the owner or person authorized to give consent."  Under R.C. 2913.04(B), "[n]o person, in any manner and by any means * * * shall knowingly gain access to, attempt to gain access to, or cause access to be gained to any computer, computer system, computer network, * * * or information service without

the consent of, or beyond the scope of the express or implied consent of, the owner of the computer, computer system, computer network, * * * or information service or other person authorized to give consent."

{¶ 198} The trial court held—and the majority agrees—that because appellees purportedly believed that Hall's LLC owned the electronic resources at issue, Key Realty is unable to establish the "knowingly" element of the offense, thus precluding its claim. The majority further reasons that even though Hall testified at deposition that "under the Agreement, materials and resources created for Key Realty, Ltd. were owned by Key Realty Ltd.," this concession is of no matter because the agreement is unenforceable.

{¶ 199} For the reasons already explained, I would find that the agreement is enforceable. So I disagree with the majority that the terms of that agreement relating to the ownership of records and accounts—which would include electronically created and stored records and accounts—are unenforceable.

{¶ 200} As to the trial court's finding that Key Realty cannot prove that appellees acted "knowingly," it is an affirmative defense to R.C. 2913.04 that "[a]t the time of the alleged offense, the actor, though mistaken, reasonably believed that the actor was authorized to use or operate the property." *See* R.C. 2913.04(E) and 2913.03(C)(1) (the affirmative defenses listed in R.C. 2913.03(C) are applicable to a charge under R.C. 2913.04). Despite the trial court's conclusion that appellees were "unwavering" in their position that Hall owned the records, the agreement that Hall signed specifically provided otherwise. And Hall's deposition testimony on this point was equivocal (he first

85.

conceded that the agreement was "very clear" that the records belonged to Key Realty, but then said he misspoke.).

{¶ 201} But even setting that aside, Hall's position—that he believed Hall's LLC owned the property—is itself a credibility issue. "If an issue is raised on summary judgment, which manifestly turns on the credibility of the witness because his testimony must be believed in order to resolve the issue, and the surrounding circumstances place the credibility of the witness in question—for example, where the potential for bias and interest is evident—then, the matter should be resolved at trial, where the trier of facts has an opportunity to observe the demeanor of the witness." *Killilea v. Sears, Roebuck & Co.*, 27 Ohio App.3d 163, 167, 499 N.E.2d 1291 (10th Dist.1985). A jury should determine whether Hall's position is credible and, if so, whether his belief was reasonable under the circumstances.

{¶ 202} I would find that a genuine issue of material fact exists concerning Key Realty's claim for unauthorized use of computer, cable, or telecommunication property.

### B. Criminal Mischief (against all appellees)

{¶ 203} Under R.C. 2909.07(A)(6)(a), "[n]o person shall * * * [w]ithout privilege to do so, and with intent to impair the functioning of any computer, computer system, computer network, computer software, or computer program, knowingly * * * [i]n any manner or by any means, including, but not limited to, computer hacking, alter, damage, destroy, or modify a computer, computer system, computer network, computer software, or computer program or data contained in a computer, computer system, computer

86.

network, computer software, or computer program." I agree with the trial court and the majority that this claim fails because Key Realty has failed to create a genuine issue of material fact that Hall intended to "impair" the functioning of any Key Realty computer, computer system, computer network, computer software, or computer program. While Hall may have intended to assert ownership or control of systems belonging to Key Realty, there is no evidence that he intended to impair its functioning.

## C. Civil Theft (against all appellees)

{¶ 204} Under R.C. 2307.61(A), a property owner may recover damages in a civil action from a person who commits a theft offense. A "theft offense" is defined in R.C. 2913.01(K)(1) to include a violation of R.C. 2911.01, 2911.02, 2911.11, 2911.12, 2911.13, 2911.31, 2911.32, 2913.02, 2913.03, 2913.04, 2913.041, 2913.05, 2913.06, 2913.11, 2913.21, 2913.31, 2913.32, 2913.33, 2913.34, 2913.40, 2913.42, 2913.43, 2913.44, 2913.45, 2913.47, 2913.48, 2913.51, 2915.05, or 2921.41. Key Realty does not specify in its complaint which theft statute appellees allegedly violated, but the majority assumes that the theft offense alleged here is R.C. 2913.04 (unauthorized use of computer, cable, or telecommunication property) and, therefore, finds that the trial court properly granted summary judgment in favor of appellees for the same reason it rejected Key Realty's claim under that statute. I would hold otherwise for the reasons explained above.

87.

### D. Extortion (against Hall)

{¶ 205} Under R.C. 2905.11(A)(1), "[n]o person, with purpose to obtain any valuable thing or valuable benefit * * * shall * * * [t]hreaten to commit any felony." The trial court and the majority reject this claim by characterizing Hall's conduct—agreeing to return Key Realty's property in exchange for its agreement to rescind the non-compete agreement—as merely an intent to negotiate with his former employer, using items he owned as leverage. To the extent that Hall threatened to continue to deprive Key Realty of property that belonged to it (i.e., engage in a theft offense) if Key Realty would not agree to release him from his non-compete agreement (i.e., a valuable benefit), I would find that a question of fact exists whether Hall's conduct rose to the level of extortion.

### XI. Civil Conspiracy (against all appellees)

{¶ 206} Finally, I believe that there are genuine disputes of material fact relating to Key Realty's civil conspiracy claim. The tort of civil conspiracy is "a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages." *Kenty v. Transamerica Premium Ins. Co.*, 72 Ohio St.3d 415, 419, 650 N.E.2d 863 (1995). An underlying unlawful act is required before a party can prevail on a civil conspiracy claim. *Williams v. Aetna Fin. Co.*, 83 Ohio St.3d 464, 475, 700 N.E.2d 859 (1998).

{¶ 207} Here, the ultimate factfinder should have the opportunity to determine whether appellees (despite their protestations to the contrary) acted in concert to injure Key Realty through such unlawful acts as tortious interference with contract and business

88.

relations, unfair competition, unauthorized use of computer, cable, or telecommunication property, theft, and extortion—all of which claims, in my opinion, should be resolved at trial. Consequently, in my view, summary judgment on the civil conspiracy claim is also inappropriate.

{¶ 208} For all these reasons, I concur, in part, and dissent, in part, from the decision of the majority.

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.

89.